# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. JOSEPH M. HEDLEY and | ) | |
| FRED A. RAUCH, III, | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No: 1:14-cv-02935-RDB** |
| | ) | |
| v. | ) | |
| | ) | |
| ABHE & SVOBODA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.    The Severn River Bridge Project ........................................................... 2

    II.    ASI Submits The Lowest Bid. ................................................................ 3

        A.    ASI Agrees To Allow Brighton To Manage The Severn River Bridge Job. ...................................................................................... 3

        B.    ASI Agrees To Use Northeast Work & Safety Boats As A DBE............... 5

    III.    Work On The Severn River Bridge Project ........................................... 7

    IV.    MSHA Makes Payments To ASI Throughout 2007 And 2008. ............ 9

    V.    MSHA Requests Quarterly DBE Participation Reports At The End Of The Job. .................................................................................................. 10

    VI.    MSHA Approves The Severn River Bridge Project And Makes Final Payment................................................................................................ 11

    VII.    Procedural History ............................................................................... 13

ARGUMENT ...................................................................................................................... 14

    I.    The False Claims Act ........................................................................... 14

    II.    No False Claims Were Submitted For Payment In Connection With The Severn River Bridge Project. .............................................................. 15

        A.    Relators Have Not Identified An Overtly False Representation In Any Claim For Payment. ............................................................. 16

        B.    Relators' Implied Certification Theory Fails. ............................ 20

            1.    The Submission of DBE Documents Was Not a Requirement For Payment Under the Contract.................... 21

            2.    The Contract Was Not Fraudulently Induced. ..................... 23

            3.    There Was No False Certification Because NWSB Performed Its Work Under the Subcontract as a DBE. ........ 24

    III.    The Alleged False Representations Were Not Material To The United States' Payment Of Claims. .................................................................. 26

US.113714382.01

IV.     Relators Have No Evidence That ASI Knowingly Made Any False
        Statements In Connection With A Claim Seeking Payments From The
        United States Government. .................................................................................. 29

V.      ASI Is Entitled To Summary Judgment On Relators' Claim For Actual
        Damages.............................................................................................................. 33

VI.     ASI Is Entitled To Summary Judgment On Relators' Conspiracy Claim. ........... 35

CONCLUSION ....................................................................................................................... 35

US.113714382.01

**<u>INTRODUCTION</u>**

Years after Defendant Abhe & Svoboda, Inc. ("ASI") successfully completed its contract with the Maryland State Highway Administration ("MSHA") to clean and paint the Severn River Bridge, Relators Joseph Hedley and Fred Rauch—who provided project management services on the job to pay off debts they owed to ASI—brought this litigation under the False Claims Act ("FCA"). Relators allege that ASI caused false claims to be submitted to the United States federal government to receive payment for its work under the Contract at issue by misrepresenting its compliance with regulations governing the use of Disadvantaged Business Enterprises ("DBE"). Specifically, Relators allege that ASI agreed with a certified DBE subcontractor, Northeast Work and Safety Boats, LLC ("NWSB"), that NWSB would be given 8% of the payments ASI received under the contract, and that in turn NWSB would allow ASI to use its name and certification to fake compliance with the DBE goal under the contract. Relators allege that ASI and NWSB entered into this agreement knowing that NWSB would not actually perform any commercially useful function on the Severn River Bridge project in violation of DBE regulations.

After their third attempt to file a complaint that satisfied the pleading standards under the Federal Rules and almost a year of discovery, involving nearly a dozen depositions and the exchange of tens of thousands of documents, Relators have no evidence to support their far-fetched allegations or satisfy the legal elements of a claim under the FCA. Relators have failed to present evidence upon which a reasonable jury could conclude that ASI caused the submission of any false claims, that any information ASI provided about DBE participation was false, that any information submitted by ASI was material to the United States' decision to issue funds for payment under the contract, or that ASI acted with the requisite intent under the FCA. In short, Relators have fundamentally failed to identify any evidence creating a genuine issue of material fact with respect to their FCA claims, and summary judgment in Relators' favor is warranted.

1

## BACKGROUND

I.     **The Severn River Bridge Project**

On April 25, 2006, the MSHA began advertising for bids on Contract No. AA4565180, a contract to clean and repaint the Pearl Harbor Memorial Bridge (colloquially referred to as the Severn River Bridge) in Anne Arundel County, Maryland (the "Contract"). (Ex. 1 at ASI_FCA00003810.)[1] The Contract was substantially funded by the Federal Highway Administration ("FHA") within the United States Department of Transportation ("DOT"). The Contract included a DBE participation goal of fifteen percent. (*Id.* at ASI_FCA00003830.) Bidders on the Severn River Bridge Project agreed to "take all necessary and reasonable steps in accordance with 49 CFR Part 26 and TEA-21 to ensure that disadvantaged business enterprises have an equal opportunity to compete for and perform on Federally funded contracts." (*Id.*) The Contract required the lowest bidder to submit an Affirmative Action Plan for the utilization of DBEs, demonstrate its good-faith efforts to meet the DBE goal, or seek a waiver for any unmet portion of the goal within 10 days of receiving notification that it was the lowest bidder. (*Id.* at ASI_FCA00003833.)

The Contract required the prevailing contractor to maintain and submit certain records related to its use of DBEs. (*Id.* at ASI_FCA00003835-3836.) The Contract also provided various procedures for the MSHA to enforce compliance with DBE requirements. If the MSHA believed that the contractor or subcontractors were not operating in compliance with the DBE provisions, the Contract provided that "the Administration Representative will conduct an investigation." (*Id.* at ASI_FCA00003836.) If the Administration Representative found non-compliance and the Contractor refused to take steps to address this non-compliance, the Contract provided that the Administrator "may direct the imposition of one or more" sanctions including "[s]uspension of work on a project, pending correction," "[w]ithholding payment or a percentage thereof, pending

---

[1] Unless otherwise noted, all exhibits referenced in this Memorandum are attached to the Declaration of James L. Volling filed herewith.

2

correction," "[r]eferral of DBE/MBE to MDOT Office of MBE for review for decertification or minority business fraud investigation," "[r]eferral to MDOT Office of MBE for review/referral to the Attorney General's Office for review for initiation of debarment," "[r]eferral to the Attorney General's Office for review for debarment or for criminal prosecution through the MDOT Office of General Counsel," or "[a]ny other action as appropriate." (*Id.*) The Contract afforded the Administrator total discretion to "determine which sanction(s) should be imposed in order to promote the purpose of the MDOT DBE/MBE Program." (*Id.*)

## II.      ASI Submits The Lowest Bid.

### A.      ASI Agrees To Allow Brighton To Manage The Severn River Bridge Job.

On June 15, 2006, ASI submitted a bid to the MSHA, offering to clean and paint the Severn River Bridge for $10.381 million. (Ex. 2 at R-6065; Ex. 3 ("Hedley Dep.") 59:19-24.) ASI submitted the bid based on an informal agreement it reached with Brighton Painting Company ("Brighton") and Brighton's owners—Relators Joseph Hedley and Fred Rauch—in an effort to assist Brighton in paying off the substantial debts it owed to ASI. (Ex. 4 ("Svoboda Dep.") 25:19-26:6 (agreeing that Brighton's involvement on the Severn River Bridge Project was "all an effort" for it to "pay down" the debt to ASI).) Brighton was not a subcontractor on the Severn River Bridge Project but was brought on to essentially act as an agent of ASI by managing the job and ensuring it was completed timely and correctly. (Svoboda Dep. 94:22-95:18) (recounting that Hedley was never an employee on Severn River Bridge and only approved invoices and bills being paid on the job).) Brighton told ASI it could manage the job and keep costs at approximately $8,300,000. (Hedley Dep. 60:11-18, 154:16-155:5; Ex. 5.) ASI in turn added a 20% markup and submitted it as the bid to the MSHA. (Svoboda Dep. 48:8-12, 59:19-60:19.) Once ASI had been paid its 20%, if Brighton was able to complete the job at a profit, those profits would be applied to Brighton's outstanding debt. (Svoboda Dep. 60:9-14; Hedley 59:7-61:9 ("Anything that we brought the job in

under the amount of money we had bid to Mr. Svoboda, that would have been applied to the debt.").)

The agreement between ASI and Brighton arose from work the two companies had conducted in early 2000, after ASI won a bid to paint a bridge in Louisville, Kentucky. (Hedley Dep. 41:4-10; Svoboda Dep. 11:7-12.) At that time, Brighton was having difficulty securing work because it had significant debts that made it impossible to satisfy bonding requirements. (Hedley Dep. 43:4-10; Svoboda Dep. 22:12-23.) Brighton approached ASI about the possibility of subcontracting on the Kentucky Job. (Svoboda Dep. 11:7-12.) ASI allowed Brighton to work on the job in an effort to "help them . . . get back on their feet." (*Id.* 21:21-22:23.)

Both ASI and Brighton eventually ceased working on the Kentucky bridge after the FBI began investigating allegations of bribes by state inspectors on the project and litigation ensued. (Hedley Del. 45:14-18, 48:13-19.) The litigation ended in settlement, with the Commonwealth of Kentucky paying ASI $12,000,000. (*Id.* 48:23-25; Svoboda Dep. 23:15-23.) Brighton's portion of the settlement was insufficient to satisfy its almost $8,000,000 debt to a bank. (Hedley Dep. 43:4-10, 49:5-8, 50:1-24.) Ultimately, ASI paid off Brighton's debt to the bank, and entered into a Credit and Security Agreement ("Agreement"), under which Brighton, Hedley, Rauch, and related entities collectively owed ASI in excess of $2,000,000. (Hedley Dep. 50:25-51:7; Svoboda Dep. 24:4-7; Ex. 6.) Although Brighton and Relators made a few payments under the Agreement, as of October 31, 2008, after ASI agreed to accept certain deeds in lieu of foreclosure, Brighton and Relators continued to owe a principal balance of $1,013,957.79 (Ex. 7.) [2] To this day, Relators have made no additional payments under the Agreement. (*Id.* ("Hedley Dep. I") 51:11-53:17.)

---

[2] ASI filed a lawsuit against Brighton and Relators as well as their affiliated companies, seeking to recover the unpaid balance on the Credit and Security Agreement. On February 3, 2017, the United States District Court for the District of Minnesota granted ASI's motion for summary judgment on its breach of contract claim. (Ex. 9.) The court awarded ASI damages in the amount of $1,694,075.28 plus attorneys' fees and costs incurred in connection with collecting the amounts

4

**B.     ASI Agrees To Use Northeast Work & Safety Boats As A DBE.**

In its bid, ASI certified that it "intend[ed] to achieve the goal stated in this contract and will use the MDOT certified MBE/DBE subcontractors/suppliers listed in Part II to accomplish this goal." (Ex. 1 at ASI_FCA00003940.) In the form for "DBE/MBE Participation" ASI listed a federally funded amount of $1,569,200.00 representing 15.16% of the total Contract value. (*Id.*) In Part II, ASI identified NWSB as the DBE firm "in this bid," and specified the items of work as "work platforms, work boats, and engineer's boat." (*Id.* at FCA00003941.) ASI knew that winning the Contract was not contingent on including a DBE in its bid. (*Id.* 64:14-20 (ASI could have gotten the job without a DBE provided it had made "a good faith effort" to obtain one).)

NWSB has been certified as a DBE by Maryland's Department of Transportation since 2004. (Ex. 11; Ex. 12 ("Casey Dep.") 23:6-7.) In 2006, NWSB was certified to "provide access equipment, inspection and bridge access equipment with trihold bolts, platforms, barges, rentals, leasing, canal barges, support barges, water transportation services, safety boats." (Casey Dep. 25:22-26:4.)

ASI first began considering NWSB's possible participation on the Severn River Bridge in May 2006 when NWSB submitted proposals to approximately ten different construction companies bidding on the Severn River Bridge, including ASI. (Casey Dep. 141:10-14, 20:6-21:4; Svoboda Dep. 100:4-10.) NWSB submitted a proposal to ASI that offered to provide an engineer's boat along with an equipment bid for barges, tugs, inspections, and safety boats to assist in the cleaning and painting of the Severn River Bridge. (Ex. 13.) ASI initially considered using NWSB to provide a safety boat and engineer's boat, but expanded the scope of NWSB's work after it learned NWSB was qualified to do platforms and riggings. (Svoboda Dep. 27:22-28:16.)

---

owed under the Credit and Security Agreement. (*Id.*) Brighton and Relators filed a motion to alter or amend the judgment, which was denied on August 9, 2017 (Ex. 10), and that judgment remains unpaid.

After it had been informed by the MSHA that it was the lowest bidder, on June 20, 2006, ASI submitted a Schedule for Participation of DBE to the MSHA. (Ex. 14.) The form listed NWSB as a "DBE/MBE firm involved in this project." (*Id.* at ASI_FCA00000202.) It identified the "work or service" as "engineers boat, safety rigging" and the agreed dollar amount for subcontracting as "$1,569,200.00." (*Id.*) ASI also submitted a DBE Disclosure and Participation Certificate, indicating that NWSB "is Prepared to Perform the Work/Service Described in Connection With the Project" described as "Engineers Boat, Safety Rigging." (Ex. 15.) The Certificate listed the dollar amount for subcontracting as "$1,569,200.00." (*Id.*) The Certificate provided that NWSB "will enter into a Written Contract with Abhe & Svoboda, Inc. for the Work/Service indicated above upon the Prime contractor's execution of a Contract with the State Highway administration. The Undersigned DBE/MBE Firm is Certified as a DBE/MBE by the Maryland Department of Transportation." (*Id.*)

When ASI submitted this Schedule, it had not yet negotiated specifics of its contractual arrangement with NWSB. (Svoboda Dep. 62:10-63:3 (testifying that it is difficult to get a firm bid from subcontractors for large jobs due to unforeseeable costs and other unknowns).) As a result, the specifics of NWSB's work were not finalized until "a couple of months after the job was bid." (*Id.*; *see* Hedley Dep. 75:18-25 (the decision to use NWSB was made after the award of the job).)

Ultimately, ASI entered into a subcontract with NWSB on October 16, 2006. (Ex. 16 at OIG 7818.) The subcontract included the following Schedule of Items:

| ITEM NO. | ITEM DESCRIPTION | UNIT | EST QTY | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 11025 | Engineer's Boat | LUMP | LUMP | $41,600.00 | $41,600.00 |
| 492585 (partial) | Engineer, Furnish, Install, and Move Quick Deck Scaffolds at Piers, Safespan Platforms between Piers, Debris Containment Tarpaulins, Aluminum Scaffold Planks, Ladders and all other Equipment and Materials Required to Provide Access to Contractor for Containment of Debris, Cleaning and Painting  Bridge | LS | 1 | $1,527,600.00 | $1,527,600.00 |
|  |  |  |  | TOTAL | $1,569,200.00 |

6

(*Id*. at OIG 7819.) NWSB made a profit on the job by receiving an 8% markup on labor and costs from ASI. (Svoboda Dep. 104:8-10.) MSHA approved use of NWSB as a subcontractor on December 16, 2006. (Ex. 17.)

**III.    Work On The Severn River Bridge Project**

MSHA notified ASI on June 15, 2006 that ASI had been awarded the Contract. (Ex. 18.) On August 29, 2006, a pre-construction meeting was held. (Ex. 19.) Mr. Svoboda, Mr. Hedley, Mr. Casey (an NWSB employee), and Mrs. Casey (NWSB's majority owner), among others, attended the meeting. (*Id.*; Hedley Dep. 76:1-15.) Work on the Severn River Bridge began after the preconstruction meeting, in the fall of 2006. (Svoboda Dep. 125:4-10.) Paul Marley, paid by ASI, was the project superintendent and worked on the Severn River Bridge site full time. (*Id.* 53:15-18, 54:13-16.)

As is common in construction projects involving unskilled labor, the labor for the Severn River Bridge was primarily sourced locally. (Marley Dep. 69:5-15.) NWSB did not have a relationship with the local union in Maryland, so Brighton and Paul Marley agreed to use their union contacts to help find union workers for the job. (Hedley Dep. 71:14-72:8; 151:14-8; Marley Dep. 128:5-9, 128:23-129:10; Ex. 20.) Using these connections, Mr. Casey arranged for the hiring of the employees he needed to perform NSWB's subcontract. (Casey Dep. 236:16-237:10.) The employees performing work for NWSB's portion of the Contract were paid by NWSB. Because NWSB did not have the capital to front payroll expenses, ASI would fund NWSB's account with the amount required for payroll, and NWSB would issue checks to its employees. (Svoboda Dep. 230:19-22; Hedley Dep. 87:19-89:6.) NWSB issued W-2s to its employees. (Hedley Dep. 89:13-20.) Brighton, in contrast, did not pay any workers on the Severn River Bridge job site—only administrative staff. (Hedley Dep. 63:20-24 (when asked if Brighton paid any employees for the Severn River Bridge Project, Hedley testified that Brighton "paid support staff in South Roxana that was doing work on the Severn River administrative side[.]").)

7

NWSB also provided workers' compensation insurance for its employees. Brighton named NWSB as an additional insured on its workers' compensation policy to cover NWSB's employees because Brighton had a better insurance rate than NWSB was able to obtain. (Svoboda Dep. 112:8-25; Hedley Dep. 99:23-100:13.) Brighton did not have any workers' compensation insurance exposure on the Severn River Bridge. (Hedley Dep. 100:7-13.)

Through the course of the Contract, Mr. Casey was frequently on the job site. (Casey Dep. 66:3-20; Marley Dep. 165:17-25; Svoboda Dep. 132:23-133:1.) Mr. Hedley, who now claims that Brighton performed the work on the Severn River Bridge, was only on the job site once per month at the beginning of the project, and less as time went on. (Hedley Dep. 73:9-16.)

With respect to the rigging and containment work under NWSB's subcontract, Mr. Svoboda designed the rigging and containment for the Severn River Bridge Project. (Svoboda Dep. 39:10-15.) ASI employees strung the main cables, but Mr. Casey supervised portions of the rigging and containment installation. (*Id.* 39:16-40:3.) The rigging and containment was also installed primarily by NWSB employees. (*Id.* 45:1-3; Casey Dep. 54:5-16.) Mr. Casey, on behalf of NWSB, also pushed barges into place at the Severn River Bridge and arranged everything related to the barge rental. (Svoboda Dep. 123:8-124:5, 176:3-25; Marley Dep. 72:2-11; Casey Dep. 127:3-21.) NWSB employees also put the containment tarps up on the Severn River Bridge. (Marley Dep. 72:2-22.) And NWSB supplied a safety boat and trained the safety boat operator. (*Id.* 75:21-76:6.)

NWSB also ordered and purchased the rigging and containment materials. (Svoboda Dep. 41:3-9, 152:4-10; Marley Dep. 74:12-24.) Because NWSB, like most businesses that qualify for DBE status, lacked capital, ASI frequently advanced funds to NWSB to allow it to pay for supplies connected with its work on the Severn River Bridge. (Svoboda Dep. 45:13-21.) Mr. Svoboda became involved in determining what materials to purchase because he had previously received defective materials from the suppliers on a different project and wanted to make sure that the

8

materials used on the Severn River Bridge met certain specifications. (Svoboda Dep. 41:14-42:1.) As the general contractor, Mr. Svoboda had input into the quality of the materials to ensure that he achieved a certain quality when the "job was done." (*Id.* 43:8-44:25.) Mr. Svoboda also spoke with Mr. and Mrs. Casey and the material suppliers regarding price to help NWSB obtain the cheapest price on the materials, as a result of Mr. Svoboda's pre-existing relationship with the suppliers. (*Id.* 42:2-19, 154:1-6 (he verified prices "so that Northeast didn't get overcharge[d] and thus I get over charge[d] and thus Joe Hedley loses money on the deal").)

**IV.    MSHA Makes Payments To ASI Throughout 2007 And 2008.**

MSHA began making partial payments to ASI for the Severn River Bridge Project on November 30, 2006. (Ex. 21 at ASI_FCA00000010; Svoboda Dep. 237:21-238:4.) Between November 30, 2006 and August 12, 2008, the MSHA made 20 payments to ASI totaling $9,860,040.49. (Ex. 21) These payments were made based on progress reports prepared by MSHA's engineer on the Severn River Bridge site, Tim Fletcher. (Ex. 22 at ASI_FCA00000351; Svoboda Dep. 89:7-20; Hedley Dep. 93:23-94:12.) The first progress report was received by MSHA on November 15, 2006. (Ex. 22 at ASI_FCA00000351.) Each progress report identified the cost to date on the Contract, the remaining funds, and the percent complete of the project. (*See, e.g., id.* at ASI_FCA00000348.) The MSHA compiled the percentages of completion that appeared on the Progress Reports. (Hedley Dep. 173:9-12.) By signing the progress reports, ASI certified that "it has made payments from proceeds of prior payments, to labor and material men, including lessors of equipment, and subcontractors, all as required by section 17-106 of the State Finance and Procurement Article of the Annotated Code of Maryland." (*Id.* at ASI_FCA00000351.) These payments were all made by the MSHA without ASI submitting any DBE quarterly reports. (Hedley Dep. 163:21-164:3.)

As part of its obligations under the Contract, ASI also submitted certified payrolls. (Ex. 1 § V(2)(c) ("Each contractor and subcontractor shall furnish, each week in which any contract work

9

is performed, to the [M]SHA resident engineer a payroll of wages paid each of its employees . . .").) The payrolls from NWSB had columns for employee information (containing names, addresses, and social security numbers), earnings, taxes, and deductions. (*See, e.g.,* Ex. 35 at ASI_FCA00000068.)

To obtain funds from the FHA, the MSHA submitted a "flat file" on a weekly basis for each of its federally-funded projects. (Decl. of Isaac Hall ¶¶ 4-5.) The flat file contains no information about the DBE goals for a particular project or whether the Contractor has met those goals. (*Id.*, Ex. B.) MSHA billed the FHA as costs were incurred on each of the MSHA's federally-funded projects. (*Id.* ¶ 5.) After it received the flat file, the FHA would transfer funds to the MSHA's bank accounts. (*Id.* ¶ 7.) The transfers covered the total amount submitted by the MSHA in each flat file—the transfers were not segregated by project. (*Id.*) The flat files were the only documents submitted by the MSHA to the FHA to obtain payment for the Contract. (*Id.* ¶ 8.)

In addition to its work preparing the progress report, the MSHA had an inspector on the Severn River Bridge job site. The MSHA inspector was frequently on-site at the Severn River Bridge Project, and knew "who was working, who is doing what." (Marley Dep. 213:10-214:1.) In particular, the inspector was interested in "what Northeast Work & Safety Boats was doing." (*Id.*) In both 2006 and 2007, the MSHA gave NWSB a letter grade "A" in a state review and rating of NWSB's performance as a subcontractor. (Ex. 23 at ASI_FCA00004810, ASI_FCA00004921.)

By November 2007, NWSB had completed its work under the subcontract and fulfilled the 15% DBE goal. (Ex. 24.) Although not required to, Mr. Hedley decided to keep NWSB on the project and proceeded to pay NWSB a 4% mark up on additional work NWSB performed beyond the subcontract. (Ex. 25.; Svoboda Dep. 105:11-106:8, 110:3-111:11; Hedley Dep. 101:21-102:10 ("the people that were there working at Northeast, we kept"), 221:20-228:13.)

**V.      MSHA Requests Quarterly DBE Participation Reports At The End Of The Job.**

On January 14, 2008, the MSHA sent ASI a latter advising ASI of the need to submit DBE participation reports. (Ex. 26) Despite receiving no response, MSHA continued to make payments

10

under the Contract. On August 7, 2008, more than eight months later, the MSHA sent another letter, indicating that the MSHA's records "show that you are missing Quarterly Reports" regarding DBE participation. (Ex. 27.) The letter informed ASI "that these reports reflect your firm's achievement toward your proposed DBE goal. Therefore, it is imperative that the quarterly DBE Participation Report be submitted in a timely and complete manner to show the actual participation on the job site." (*Id.*) The letter requested that ASI submit the information by August 15, 2008. (*Id.*)

On September 17, 2008 the MSHA sent a follow-up letter. (Ex. 28.) Because ASI had not submitted quarterly reports, the MSHA placed ASI in "Non-Compliance" for purposes the Contract. (*Id.*) The letter informed ASI that failure to submit information within seven days "may result in this matter being referred to District 5 for further action, up to and including suspension of payment for the above referenced contract until requested documents are received." (*Id.*)

In response, ASI submitted quarterly DBE participation reports to the MSHA on October 2, 2008. (Ex. 29.) The reports list the percentage of project completion, the name of the DBE, the "items of work & services performed," the percentage of DBE completion, the proposed dollar amount of work to be performed by the DBE, the "total dollars paid this period," and the "total dollars paid to date." (*See, e.g.*, Ex. 29 at ASI_FCA00000612.) The quarterly reports also attached all checks reflecting payments from ASI to NWSB. (*See, e.g.*, *id.* at ASI_FCA00000614-628.)

## VI.    MSHA Approves The Severn River Bridge Project And Makes Final Payment.

After receiving ASI's DBE quarterly reports, MSHA made one additional payment of $236.00 to ASI under the Contract. (Ex. 21 at ASI_FCA00000030.)

The MSHA completed a final inspection and approved the work performed under the Contract on July 17, 2008. (Hedley Dep. 95:12-15, 157:17-158:6; Ex. 30.) Work on the Contract was completed for less than the bid price. (Hedley Dep. 95:16-19, 162:2-13; Ex. 31.)

On September 24, 2008, ASI submitted a Request for Approval of Subcontractor for NWSB. (Ex. 32.) The Request for Approval indicated that the subcontractor was a DBE "listed on an

11

affirmative action plan." (*Id.* at ASI_FCA00000192.) The Request for Approval answered "YES" to the question "Has Prime Contractor Previously met MBE/DBE Goals?" and that "MBE/DBE submitted to date" was "15.12%." (*Id.*) The form also contained a "certification of existing contract between prime contractor/subcontractor" identifying the "general scope of work" as "provide engineer's boat for duration of project, engineer, furnish, install, and move quikdeck scaffolds at piers, safespan platforms between piers, debris containment tarpaulins, aluminum scaffold planks, ladders and all other equipment and materials required to provide access to contractor for containment of debris, cleaning and painting bridge." (*Id.* at ASI_FCA00000194.) ASI also certified that it had "entered into a written subcontract agreement with" NWSB and that NWSB "has acknowledged that they have received and are responsible for all provisions of the contract." (*Id.* at ASI_FCA00000195.)

On December 5, 2008, ASI applied for final payment under the Contract. (Ex. 33.) The application listed the date work started, the date the Contract completed, and the days charged to the project. (*Id.*) ASI certified that "this final statement covering work performed and materials furnished and used on the above named contract is correct and that final payment therefore has not been received." (*Id.* at ASI_FCA00004997.) ASI also certified "that it has made payments from proceeds of prior payments, to labor and material men, including lessors of equipment, and sub-contractors, all as required by section 17-106 of the State Finance and Procurement Article of the Annotated Code of Maryland and that it shall make like and timely payments from the proceeds of this payment as statutorily so required." (*Id.*) The Deputy Director of Bridge Inspection for MSHA certified "that the quantities as shown above are correct and that construction has been completed in accordance with the terms of the contract." (*Id.*) MSHA paid ASI the remittance amount of $521,582.51 on February 9, 2009. (Ex. 21 at ASI_FCA00000031.)

US.113714382.01

## VII.    Procedural History

At the time of the Severn River Bridge Project, Brighton was not a cash flowing business. (Hedley Dep. 110:15-113:15.) It never paid any employees on the job site and did not purchase any materials. In fact, throughout the course of the project, Mr. Hedley repeatedly requested that ASI advance money to Brighton to cover Brighton's various obligations. (Ex. 34; Hedley Dep. 110:15-113:15, 123:16-124:6.) Brighton also owed $1.5 million to Mr. Rauch and $350,000 to Mr. Hedley's sister who had purchased Brighton debt from a bank for $350,000. (Hedley Dep. 124:11-125:7.) Brighton eventually went out of business in June 2010. (Hedley Dep. 267:12-14.)

Bent on escaping their payment obligations to ASI and recouping losses caused by their failed business, Relators initiated this qui tam FCA action on April 25, 2011 by filing a Complaint in the Southern District of Illinois. (Dkt. Nos. 1-2.) Before initiating this action, Mr. Hedley never raised any concerns about the use of NWSB to Mr. Svoboda, the MSHA, or the United States government. (Hedley Dep. 83:9-22.) Relators alleged that payments ASI received under the Contract violated the FCA because ASI misrepresented its use of a DBE in fulfilling its obligations under the Contract. (Dkt. No. 2 ¶¶ 8-9.) After the United States elected to intervene, Plaintiffs filed a First Amended Complaint raising substantially similar allegations as in the original Complaint. (Dkt. No. 19.) ASI moved to dismiss the First Amended Complaint or to transfer venue, and the case was transferred to this District. (Dkt. Nos. 33, 63-64.)

After the case was transferred, the United States withdrew its intervention. (Dkt. No. 52.) ASI then moved to dismiss the First Amended Complaint. (Dkt. No. 76.) The Court granted ASI's motion to dismiss and allowed Relators to replead some of their claims. (Dkt. Nos. 84-85, 92.)

Relators filed a Second Amended Complaint on February 1, 2016 (Dkt. No. 93), and ASI moved to dismiss (Dkt. No. 97). The Court denied ASI's motion to dismiss, finding that Relators finally adequately pled a claim under the FCA. The Court concluded that Relators had adequately pled the submission of false claims based on the allegations that certification of compliance with all

13

DBE regulations was a condition of payment under the Contract. (Dkt. No. 102 at 13-14.) The Court also concluded Relators had pled materiality because they averred that the statements at issue were "'capable' of influencing government action." (*Id.* at 16). The Court noted, however, that none of the allegations were sufficient to prove the submission of false claims or the materiality of the misrepresentations. (*Id.* at 13-16.) Similarly, the Court concluded that Relators had pled damages sufficient to survive a motion to dismiss. (*Id.* at 19.) But the Court declined to adopt a standard for measuring damages and stated that after discovery Relators would be "required to prove damages" under the FCA. (*Id.*) Relators filed a Third Amended Complaint on December 1, 2016 that raises substantially identical claims as those alleged in the Second Amended Complaint. (Dkt. No. 118.)

## <u>ARGUMENT</u>

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of showing that the materials facts in the case are undisputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is insufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is also proper where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990).

## I.      The False Claims Act

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government or

US.113714382.01

"knowingly makes, uses, or causes to be made or used, a false record or statement material to [such] a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A), (B). The FCA "was not designed to punish every type of fraud committed upon the government." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("*Harrison I*"). Instead, "[t]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Id.*

To prevail on their FCA claim, Relators must prove that: (1) defendant made a false statement or engaged in a fraudulent course of conduct; (2) the statement or conduct was material; (3) such statement or conduct was made or carried out with the requisite scienter; and (4) the statement or conduct caused the government to pay out money or to forfeit money due. *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) ("*Harrison II*"). The crux of Relators' claim is that NWSB did not perform a commercially useful function on the Severn River Bridge Project and therefore could not be counted by ASI toward satisfaction of the Contract's DBE goal. Relators' claim ignores the evidence and fails to satisfy the requisite elements of an FCA claim as a matter of law.

## II. No False Claims Were Submitted For Payment In Connection With The Severn River Bridge Project.

The focus of the FCA is "on those who present or directly induce the submission of false or fraudulent claims" to the federal government. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. ___, 136 S. Ct. 1989, 1996 (2016); *see United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526 (D. Md. 2006). A relator "must show that the government paid a false claim to prove a violation" of the FCA. *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 733 (4th Cir. 2010); *Harrison I*, 176 F.3d at 785 ("[T]he False Claims Act at least requires the presence of a claim—a call upon the government fisc—for liability to attach.").

15

A claim for payment can be "false" in three ways. First, it can be factually false, such as where "the claimant misrepresents what goods or services . . . it provided to the Government." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). Second, it can expressly certify compliance with material conditions of payment that the claimant did not, in fact, comply with. *See United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1267 (D.C. Cir. 2010). Third, a claim can impliedly certify compliance with material conditions of payment that the claimant did not, in fact, comply with. *See Escobar*, 136 S. Ct. at 1995. Relators have no evidence that claims satisfying any of these criteria were submitted to the United States in connection with the Severn River Bridge Project.

### A.     Relators Have Not Identified An Overtly False Representation In Any Claim For Payment.

Under either a factually false theory or an express false certification theory, Relators must identify an overtly false representation in the claim for payment. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008); *Wilkins*, 659 F.3d at 305. "A fundamental requirement of the FCA, regardless of the section allegedly violated, is that the false or fraudulent claims or statements at issue must be objectively false." *United States v. Savannah River Nuclear Solutions, LLC*, 2016 WL 7104823, at *13 (D.S.C. Dec. 6, 2016). Fraud under the FCA "may only be found in expressions of fact which (1) admit of being adjudged true or false in a way that (2) admit of empirical verification." *Harrison I*, 176 F.3d at 792. Relators cannot establish an overt falsity. Relators do not seriously contend that the DBE-related documents submitted by ASI were actually false on their face. Implicit in all of Relators' allegations is an assumption that ASI affirmatively misrepresented that NWSB performed a commercially useful function on the Severn River Bridge. But that representation does not appear in the documents submitted by ASI.

First, Relators have identified nothing in the DBE-related documents submitted by ASI to the MSHA that was overtly false. Throughout the course of this lawsuit, Relators have identified

16

five categories of documents as allegedly constituting false statements that purportedly caused the United States to pay false claims: (1) ASI's initial bid proposal (Dkt. No. 123 ¶¶ 34-36); (2) the DBE quarterly participation reports (*id.* ¶¶ 62-65; 78-79); (3) payroll documents (*id.* ¶¶ 50-53, 59-60); progress estimates (*id.* ¶¶ 80-81, 91); and certifications for final payment (*id.* ¶¶ 95, 98-99). None of these documents contain a representation that was false.

ASI's initial bid proposal indicated that it intended "to achieve the goal stated in this contract and will use [NWSB] to accomplish this goal." (Ex. 2 at R-6065.) NWSB was listed as the DBE firm "in this bid." (*Id.* at R-6066.) Relators have presented no evidence that this statement was false when made in June 2006. In other words, Relators have no evidence that when ASI submitted the bid proposal it, in fact, intended not to achieve the Contract's DBE goal and use NWSB to accomplish that goal. In fact, Relators admit that any alleged fraudulent scheme between NWSB and ASI was not formed until September 2006, long after ASI's bid had been submitted and the Contract awarded. (Ex. 2; Hedley Dep. 248:12-249:3.) Furthermore, Relators have not shown—as they must—that this statement expressly, and falsely, stated that NWSB would perform a commercially useful function on the Severn River Bridge Project. Instead, the bid merely expresses an intention to use NWSB as the DBE firm "in this bid."

The DBE quarterly participation reports similarly contain no express misrepresentation. Relators claim these reports were false because they "represented that NWSB performed items of work and service on the Project involving the Engineer's Boat and partial cleaning and painting of the Bridge," they "represented that ASI had paid NWSB . . . during the quarterly reporting period, when that amount had not been paid to NWSB," and "represented that ASI had achieved [a certain percentage of] completion on its DBE utilization requirement, when in fact no DBE had performed a commercially useful function on the Project." (Dkt. 123 ¶ 6.) It is undisputed, however, that NWSB performed work on the project and received all payments from ASI required under the

17

subcontract, so representations about work and payments were not false. Furthermore, the quarterly reports say nothing about a commercially useful function nor do they purport to certify compliance with every DBE program regulation. The reports simply list a percentage under the heading "DBE/MBE % OF COMPLETION." (Ex. 29, *see, e.g.*, ASI_FCA00000612.) Relators have presented no evidence that the DBE portion of the Contract was not complete in the percentages listed on the quarterly reports during the time periods for which they were submitted.

Relators also have not demonstrated the falsity of the payroll records or the progress reports. The progress reports cannot constitute a false statement of ASI because they were prepared by the State of Maryland's engineer. Furthermore, each progress report accurately identified the cost to date on the Contract, the remaining funds, and the percentage completion of the project. (Ex. 22 at ASI_FCA00000352.) Relators have not disputed that any of the numbers listed on those forms are inaccurate. In submitting the progress reports, ASI certified only that it "has made payments from proceeds of prior payments, to labor and material men, including lessors and equipment, and subcontractors." (*Id.* at ASI_FCA00000351.) It is undisputed that ASI made payment to NSWB. And nothing in the progress reports says anything about DBE utilization or commercially useful function. In fact, Mr. Hedley admitted that the progress reports "were not false. That was the status of the job." (Hedley Dep. 173:21-25.) Likewise, the payroll reports simply list the names of individuals who were paid by NWSB and the amounts they were paid. It is undisputed that these individuals received paychecks from NWSB and NWSB issued them W-2s. Again, these reports say nothing about DBE utilization or commercially useful functions, and therefore do not support Relator's FCA claims.

Finally, the certifications for final payment do not contain any false statements. Relators allege the certifications were false in that "ASI had not met its DBE goal, NWSB did not have a subcontract on the Project, NWSB was not responsible for any work on the project, and NWSB was

18

not paid $1,569,200.00." (Dkt. 123 ¶ 94.) Nothing in the certifications for final payment contain an express representation that NWSB performed a commercially useful function. But the certifications do truthfully state that NWSB had a subcontract on the project (Ex. 35), performed work on the project (*see supra* at R-152), and was paid $1,569,200.00 (Ex. 32.)

Even if Relators could demonstrate that any of the DBE-related documents contained overt falsity, their FCA claim would still fail because they cannot connect that falsity to the submission of any claims to the United States. It is undisputed that none of the information submitted by ASI in connection with DBE participation was used by the MSHA to obtain payment from the United States. As explained above, to obtain funds from the FHA, the MSHA submitted a "flat file" on a weekly basis for each of its federally-funded projects. (Hall Decl. ¶¶ 4-5.) The flat file contained information about costs incurred on the MSHA's projects, but contained no information about the DBE goals for a particular project, whether the contractor on the project had agreed to meet the DBE goals, or whether the contractor was actually using a DBE to meet those goals. (*Id.*, Ex. C.) Because the flat files were the only documents submitted by the MSHA to the FHA to obtain payment, Relators cannot demonstrate that the submission of any alleged false statements in connection with ASI's DBE reporting caused the payment of false claims. *See United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 294-95 (E.D.N.Y. 2016) (no FCA claim where although defendant certified compliance it was not alleged that defendant "submitted a *claim* in which it expressly certified such compliance").

Because Relators have not identified that any overly false representations were used to present a false claim, their FCA claim, if any, is limited to a theory of implied certification. *See Science Applications*, 626 F.3d at 1267 ("[B]ecause the actual claims for payment submitted by SAIC were accurate reports of services rendered that made no reference to whether the company had complied with [contractual provisions] . . . the government must prove that SAIC's claims for

19

payment were impliedly false for either FCA cause of action to succeed."); *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (2002) ("The False Claims Act . . . focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme.").

### B.    Relators' Implied Certification Theory Fails.

An implied certification claim "arises when a claim for payment that is submitted to the government rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 498 (D.S.C. 2016). In ruling on ASI's motion to dismiss, the Court concluded that Relators had plausibly alleged two implied certification theories that, if true, could state a claim under the FCA. First, the Court explained that Relators may be able to show that false claims were submitted if they could demonstrate that MSHA required the submission of DBE-related documents as a condition of payment under the Contract, MSHA in turn submitted claims to the United States for the requisite funds to pay ASI, and the DOT requires participating states to award contracts only to contractors complying with the state DBE requirements. (Dkt. 102 at 13-14.) Second, the Court found that Relators had adequately stated an implied certification claim based on the allegation that ASI "fraudulently secured the Contract by certifying in its bid proposal its intention to use NWSB to comply with MSHA's DBE participation goal." (*Id.* at 14.) Accordingly, the Court allowed Relators the opportunity to *prove* that "MSHA required the certification of DBE compliance prior to payment of the designated federal funds." (*Id.* at 15.) After months of discovery, ASI is entitled to summary judgment because Relators have been unable to identify any evidence to substantiate these allegations. *See Anderson*, 477 U.S. at 248 (non-moving party may not rest upon "mere allegations" but must "set forth specific facts showing that there is a genuine issue for trial").

20

### 1.    The Submission of DBE Documents Was Not a Requirement For Payment Under the Contract.

Relators cannot establish that the United States made payment on a false claim as a result of any DBE certification because all of the allegations in the Third Amended Complaint related to the DBE "requirements" are contradicted by the undisputed facts.

First, there is no evidence that the MSHA required the submission of any DBE documents as a condition of payment under the Contract, as Relators alleged. (*See, e.g.*, Dkt. 123 ¶¶ 48, 52, 62-67.) In fact, the undisputed facts show the opposite. As an initial matter, the award of the Contract was not conditioned on satisfaction of the DBE goal. (Ex. 1 at ASI_FCA00003834.) A bidder was free under the Contract not to retain a DBE at all, provided it could show good-faith efforts to meet the goal. (*Id.*; Svoboda Dep. 64:14-20.) Furthermore, the Contract indicated that payment was not conditioned on receipt of any DBE documents. Instead, the Contract set up framework that provided the MSHA with great discretion in regulating DBE compliance. Under the Contract <u>if</u> the MSHA conducted an investigation and found non-compliance and <u>if</u> the contractor failed to take steps to address the non-compliance, <u>then</u> the Contract provided that the MSHA <u>may</u> direct the imposition of one or more sanctions, only one of which included "[w]ithholding payment or a percentage thereof." (*Id.* at ASI_FCA00003836.) This hardly demonstrates that the MSHA was required to withhold payment due to a contractor's failure to comply with DBE requirements.

That the submission of DBE-related documents was not a condition of payment is perhaps best demonstrated by the fact that the MSHA paid ASI more than $9,000,000 under the Contract without receiving the DBE quarterly reports that Relators now claim were required in order to obtain payment. The record indicates that the MSHA was aware that it had not received quarterly DBE reports and reminded ASI in January 2008 of its obligation to submit reports. (Ex. 26.) Even though it did not receive reports, the MSHA continued to make payments to ASI. (Ex. 21.) And when MSHA finally placed ASI in non-compliance for failure to submit reports it did not state that

it would be withholding payment under the Contract. Rather, the letter stated only that ASI's failure to submit information "may result in this matter being referred to District 5 for further action, up to and including suspension of payment." (Ex. 28 (emphasis added).)

Second, contrary to Relators' allegations, the structure of the DBE regulations confirms that the FHA had no DBE requirements for the Contract and did not condition its payment of funds to MSHA on the satisfaction of a particular DBE requirement on the Severn River Bridge Project. Accordingly, Relators cannot link any purported DBE requirement to the receipt of federal dollars.

Under the DBE program, recipients of federal transportation funds are required to set an annual aspiration goal for DBE participation that must be based upon evidence of available DBEs and the level of participation that would be expected of DBEs in the absence of discrimination. 49 C.F.R. § 26.45(a)-(b). After setting its annual goal, a state recipient is required "to meet the maximum feasible portion of [its] overall goal by using race-neutral means of facilitating DBE participation." 49 C.F.R. § 26.51(a). DBE participation is race-neutral if a DBE wins a prime contract through normal competitive procedures, is awarded a subcontract on a project that has no DBE goal, or wins a subcontract on a project with a DBE goal where the prime contractor did not consider its DBE status in awarding the subcontract. *Id.*

If a recipient determines that it will be unable to achieve its goal solely through the use of race-neutral means, it must establish contract goals on USDOT-assisted contracts that have subcontracting possibilities to meet the remainder of its overall goal. 49 C.F.R. § 26.51(d), (e)(1). With respect to contract goals, federal regulations allow recipients great flexibility. Recipients are not required to set a contract goal for every USDOT-assisted contract, nor is the percentage level for each contract goal required to meet the overall goal. 49 C.F.R. § 26.51(e)(2). Recipients are required to adjust their use of contract goals throughout the year, to ensure that the maximum amount of the overall goal is met through race-neutral means, and that use of contract goals does

22

not result in attaining DBE participation beyond the overall goal. 49 C.F.R. § 26.51(f). The USDOT does not monitor individual contract goals, but merely reviews each recipient's goal setting on an annual basis. *See* 49 C.F.R. § 26.51(c).

Goals set pursuant to the DBE Program are aspirational only. A recipient "cannot be penalized, or treated by [USDOT] as being in noncompliance" with the DBE Program because a recipient's "DBE participation falls short of [its] overall goal." 49 C.F.R. § 26.47(a). Additionally, to increase local flexibility in program implementation, the federal regulations allow recipients to apply for exemptions or waivers from almost any of the program's requirements, including overall goals, contract goals, or good-faith efforts. 49 C.F.R. § 26.15(b).

The structure of the DBE program confirms that the FHA was not conditioning money under the Contract on DBE participation of any kind. The FHA would have had no way of knowing whether the Contract had a particular DBE goal and whether it was being met when it was making payment to the MSHA. After months of discovery, Relators have nothing more than the general allegation that but for the submission of DBE documents, the United States would not have disbursed money under the Contract. This allegation, in the absence of any evidence to prove it, is insufficient to establish the submission of a false claim, and ASI is entitled to judgment as a matter of law. *See United States ex rel. Jones v. Collegiate Funding Servs., Inc.*, 469 F. App'x 244, 259 (4th Cir. 2012) ("broad inferential claim that but-for the certifications, the loans would not have been disbursed" were insufficient even at the pleading stage).

**2.      The Contract Was Not Fraudulently Induced.**

Under the "fraud-in-the-inducement" theory, Relators can demonstrate the payment of false claims if they can show that the Contract "was obtained originally through false statements or fraudulent conduct." *Harrison I*, 176 F.3d at 787. Even believing Relators' allegations, *arguendo*, that ASI entered into a conspiracy with NWSB whereby NWSB would perform no work on the

23

Severn River Bridge but lend its name for DBE purposes, the undisputed chronology here precludes any fraudulent inducement claim.

ASI's initial bid proposal submitted in June 2006 indicated that it intended "to achieve the goal stated in this contract and will use [NWSB] to accomplish this goal." (Ex. 2 at R-6065.) NWSB was listed as the DBE firm "in this bid." (*Id.* at R-6066.) At this time it is undisputed that ASI had not yet finished negotiating a scope of work with NWSB, had not entered into a subcontract, and had not finalized details about materials, job specifications, and the like. (Ex. 16.) Thus, there is no evidence that as of June 2006, ASI in fact intended not to achieve the DBE goal stated in the Contract. Relators have presented no evidence that this statement was false when made in June 2006. As Relators themselves admit, any alleged fraudulent scheme between NWSB and ASI was not formed until September 2006, long after ASI's bid had been submitted and the Contract awarded. (Ex. 1; Hedley Dep. 248:12-249:3.) Because there is no evidence upon which a reasonable jury could find fraud in the original submission of ASI's bid documents, Relators' fraudulent inducement theory fails.

### 3. There Was No False Certification Because NWSB Performed Its Work Under the Subcontract as a DBE.

ASI is entitled to summary judgment for the additional reason that the undisputed facts show NWSB did, in fact, perform a commercially useful function on the Severn River Bridge.

Regulations governing the DBE program provide that "[w]hen a DBE participates in a contract, you count only the value of the work actually performed by the DBE toward DBE goals." 49 C.F.R. § 26.55(a). The regulations further provide that you may "[c]ount expenditures to a DBE contractor toward DBE goals only if the DBE is performing a commercially useful function on that contract." 49 C.F.R. § 26.55(c). A DBE is presumed not to be performing a commercially useful function if it "does not perform or exercise responsibility for at least 30 percent of the total cost of its contract with its own work force." 49 C.F.R. § 26.55(c)(3).

US.113714382.01

Although Relators have focused on ASI's involvement in the selection of materials used in NWSB's work and overall supervision of the job and NWSB's employees, the undisputed and material facts showing that NWSB performed a commercially useful function within the meaning of the regulations. NWSB obtained employees for the job in a manner consistent with industry practice, by sourcing workers from a local union. It is undisputed that these employees were on NWSB's payroll and that NWSB was responsible for their benefits and workers' compensation insurance. (Marley Dep. 38:2-3, 69:11-15, 73:6-8.)

The record also reflects that NWSB performed rigging and containment work and provided the boats and barges reflected in the subcontract. These tasks were performed by NWSB employees, and it is undisputed that Mr. Casey was frequently present on the job site and NWSB employees were functioning in a field supervisory role. (Marley Dep. 109:7-11 ("Jack was involved in finding the boats…John Gorsuch was in charge of multiple employees on the bridge."), 109:5-11; 113:12-15, 114:6-13 (there were multiple NWSB employees in charge), 165:12-21.) Similarly, it is undisputed that NWSB ordered and paid for the materials it used in completing the subcontract. Although Mr. Svoboda—as the general contractor who was ultimately responsible for the quality of the job—made determinations about the type of scaffolding and equipment and helped NWSB obtain a favorable price for those materials, nothing in the DBE regulations prohibits such assistance to a DBE. In fact, although Relators now claim that NWSB did nothing on the job, Mr. Hedley decided to keep NWSB on the job and continue paying NWSB a 4% markup, even after the DBE requirement under the subcontract had been satisfied. Mr. Hedley's decision would have been completely illogical if NWSB truly was not performing valuable work on the job. Thus, to the extent ASI's submission of DBE-related documents could be construed as a representation that NWSB performed a commercially useful function, those documents were not false because NWSB did, in fact, perform such a function.

25

### III.    The Alleged False Representations Were Not Material To The United States' Payment Of Claims.

The United States Supreme Court recently resolved a Circuit split holding that "the implied false certification theory can be a basis for liability" under the FCA.  *See Escobar*, 136 S. Ct. at 1995. In *Escobar*, the Court held that implied false certification can be a basis for liability where "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those misrepresentations misleading half-truths." *Id.* at 2001. But the "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Id.* at 2002.

The unanimous *Escobar* Court clarified how rigorously the FCA's "demanding" materiality standard must be enforced. *Id.* at 2003. To meet this exacting materiality standard, it is insufficient for a relator to merely show that "the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  *Id.* at 2003; *see also United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3rd Cir. 2017) ("[T]he mere fact that [regulatory compliance] is a condition of payment, without more, does not establish materiality."). Similarly, it is not sufficient "for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 136 S. Ct. at 2003. Instead, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002.[3] "By enforcing [the materiality] requirement rigorously, courts will ensure that government contractors will not face onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements established by contract. Payment requests by a contractor who has violated minor contractual provisions that are

---

US.113714382.01

26

merely ancillary to the parties' bargain are neither false nor fraudulent." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 333 (9th Cir. 2017).

Relators have presented no evidence demonstrating the materiality of any DBE-related documents submitted by ASI or any alleged non-compliance with DBE regulations. Instead, the undisputed evidence demonstrates that any technical non-compliance by ASI was not material. Relators, for example, have identified no regulation identifying compliance with DBE regulations as a condition of payment from the federal government. Relators have no evidence of instances where the federal government refused to pay a claim on the basis of non-compliance with DBE requirements. *United States ex rel. Schimelpfenig v. Dr. Reddy's Labs, Ltd.*, 2017 WL 1133956, at *2 (E.D. Pa. Mar. 27, 2017) (allegations of materiality insufficient where plaintiffs allege that the federal government found the issue important enough to regulate but did not establish that the government's payment decision "was influenced by claimant's purported compliance with a particular requirement"). Nor have Relators presented any evidence that either the MSHA or the federal government took any action in this matter, such as revoking ASI contractor's license or suspending NWSB's DBE certification which would be consistent with a determination that the DBE regulations are material to payment decisions. Instead, both Maryland and the federal government have continued to do business with ASI and NWSB. *See United States v. Triple Canopy, Inc.*, 857 F.3d 174, 179 (4th Cir. 2017) (finding materiality in part because "the Government did not renew its contract for base security with Triple Canopy and immediately intervened in the litigation").

Relators have provided no evidence that the United States or the Maryland based their payment decisions on any certification, implicit or otherwise, submitted in any claim. At most, Relators point to the regulatory framework to imply that strict compliance with the DBE program must have been important to payments of claims related to the Contract. But alleged

US.113714382.01

misrepresentations "cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 136 S. Ct. at 2003. The absence of more is fatal. The undisputed record reveals no evidence establishing the materiality of any purported misrepresentation to any payment of federal monies.

Instead, the record is replete with facts showing that DBE compliance was not material to payment by the FHA. For example, MSHA paid over 90% of the Contract price to ASI without ever receiving DBE quarterly participation reports, indicating that such reports could not have been material to payment. (Ex. 21.) Similarly, the undisputed evidence shows that ASI submissions to the MSHA did not affect the federal government's payment decisions. (Ex. 28.) The FHA never received any information about the Contract's DBE goal or any efforts to comply with that goal before it issued payment to the MSHA. Thus, the DBE-related documents were not even submitted to and thus could not have influenced the federal government's decision to make payments on the Contract. *See Wilson*, 525 F.3d at 379 (concluding that documents not submitted to the government at the time it made a decision could not have influenced the government's decision).

Furthermore, the MSHA had representatives present on the job who monitored the progress of work under the Contract, prepared and signed progress reports, and assigned NWSB an "A" grade for its work as a subcontractor. If Relators are correct that NWSB was not actually performing a commercially useful function, the MSHA's continued payment despite observing that purported "non-performance" precludes a finding of materiality. *See Escobar*, 136 S. Ct. at 2003-04 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated; that is very strong evidence that those requirements are not material."); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447-48 (7th Cir. 2016).

28

Simply put, Relators have presented no evidence establishing the materiality of ASI's alleged misrepresentations to the federal government's payment decisions. Instead, Relators have nothing but their bare allegations based on a series of unsubstantiated leaps in logic that each of the documents submitted by ASI "caused MSHA to submit a claim for payment to the FHWA," that each of the claims "were false in that they were based on the DBE requirements being fulfilled," that "[h]ad MSHA been aware of the fraudulent representations, they would not have submitted the claims to FHWA," and that "had FHWA been aware it would not have paid those claims." (Dkt. 123 ¶ 80.) But there is no evidence in the record to support these assertions. At summary judgment, simply stating that the MSHA and the United States would not have paid claims had they known that NWSB was not performing a commercially useful function on the Contract is woefully insufficient to meet the demanding materiality test under *Escobar*. *See Sanford-Brown*, 840 F.3d at 447-48 (granting summary judgment on FCA claim where "[a]t bottom, even assuming Nelson's allegations are true, the most he has shown is that SBC's supposed noncompliance and misrepresentations would have entitled the government to decline payment. Under *Universal Health*, that is not enough."); *ex rel. Schimelpfenig*, 2017 WL 1133956, at *5 (dismissing FCA claim where relators did not allege facts establishing that defendants' failure to disclose noncompliance with two regulations "was material to the Government's payment decision"); *United States ex rel. Southeastern Carpenters Reg'l Council v. Fulton Cnty., Ga.*, 2016 WL 4158392, at *8 (N.D. Ga. Aug. 5, 2016) (dismissing FCA claim where relators "have not shown that Defendants misrepresented matters so central to the Contract that the government would not have paid [Defendants'] claims had it known of these violations").

## IV.    Relators Have No Evidence That ASI Knowingly Made Any False Statements In Connection With A Claim Seeking Payments From The United States Government.

Relators allege generally that ASI knew at the time it submitted various documents regarding DBE participation on the Severn River Bridge that the documents were false because it

"knew that NWSB would not perform any work on the Contract, that NWSB would be paid only 8% of the Contract price, and that Brighton would perform NWSB's work under the Contract." (Dkt. 123 ¶ 35; *see also id.* ¶¶ 41-42.) ASI is entitled to summary judgment because after months of discovery, Relators have failed to present any evidence to support these allegations.

The FCA prohibits a person from "knowingly" presenting or making a false statement in connection with a claim seeking payment from the United States. 31 U.S.C. § 3729(a)(1)-(2). "Knowingly" means that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). The FCA cannot be used to "punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Owens*, 612 F.3d 724, 728. Nor does it allow a relator to "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act." *Wilson*, 525 F.3d at 373. Furthermore a defendant's "reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud." *United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013). Even if a defendant is aware of regulations or contractual requirements, it lacks knowledge "if the particular false statements were the result of a difference in interpretation or even negligence." *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015).

Ultimately "[t]he relevant question is whether the defendant knowingly violated a requirement that the *defendant knows is material* to the government's decision to pay a claim." *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 670 Fed. App'x 126, 127 (4th Cir. 2016) (emphasis added); *United States ex rel. Joslin v. Cmty. Home Health of Md., Inc.*, 984 F. Supp. 374, 383 (D. Md. 1997) ("The requisite intent for FCA liability is the knowing presentation of what is known to be false."). Thus, Relators must show not only that the purported misrepresentations were

30

material to the government's decision to pay—which they fail to do—but also that ASI knew that the representation was false <u>and</u> that the representation was material to the government's decision to pay. *See United States ex. rel. Joslin*, 984 F. Supp. at 383.. Relators have no evidence that ASI knowingly presented any false information.

As an initial matter, Relators have no evidence upon which a reasonable jury could conclude that ASI knew that the representations regarding DBE participation were material to the federal government's decision to pay for work on the Severn River Bridge. Instead, the record shows the government's tacit approval of ASI's operations. *See United States ex rel. Owens*, 612 F.3d at 729 (evidence that government was aware of any alleged defects and accepted the work anyway "effectively negates the fraud or falsity required by the FCA"). The MSHA project manager on the job prepared progress estimates submitted for payment. Payments were made under the Contract by MSHA without any certification as to compliance with "commercially useful function" regulations. Further, almost all payments under the Contract were made despite ASI not submitting DBE quarterly reports. The government's actions were consistent with the Contract language which nowhere stated that compliance with DBE requirements was a condition of payment. In the face of this evidence, Relators cannot establish that ASI knew that any DBE-related documentation would be material to the federal government's decision to make a payment under the Contract.

Furthermore, even if Relators could establish that NWSB in some respect was not performing a commercially useful function, at the very most that simply evidences a difference of opinion over the highly technical application of a vague regulation to the daily activities of dozens of workers on a multi-million dollar construction job site. This difference of opinion regarding application of that regulation cannot establish scienter under the FCA.

Mr. Svoboda was in charge of DBE contracting for ASI. (Svoboda Dep. 33:4-7.) He testified that the DBE requirements are difficult to understand, and no one "understands really . . . what the

31

requirements are." (*Id.* 33:8-14.) But he understood the DBE requirements "as well as the average construction contractor understands it," and knew that to get credit toward a disadvantaged business contract goal, he needed to "subcontract the work to a firm that is certificated by the owner as a disadvantaged business." (*Id.* 33:12-22.) Specifically, Mr. Svoboda knew that a DBE must: (1) be capable of performing th[e] work, (2) perform the work that they've contracted and are obligated to perform, (3) hire and pay its laborers, and (4) acquire and pay for materials for use in the DBE's portion of the contract. (*Id.* 34:7-35:7.) With respect to the meaning of commercially useful function, Mr. Svoboda explained that he is not an attorney and does not know "what that means exactly," but knew the DBE "has to do some work on the job." (*Id.* 35:8-14.)

It is undisputed that NWSB was performing these functions on the Severn River Bridge. NWSB arranged for and paid its laborers and ordered and paid for the materials it needed under the subcontract. NWSB's employees performed rigging and containment work and operated the safety boat. Mr. Casey also frequently visited the job site and NWSB employees performed field supervisory functions. Relators would now like to quibble about Mr. Svoboda's actions in communicating with suppliers, and scrutinize each hour of work performed on the job to determine whether ASI employees provided any assistance with that work. But even if these technicalities could raise issues under the DBE regulations, there is simply no evidence in the record that ASI knew these actions constituted a violation of the general language defining commercially useful function. *See United States ex rel. Sheet Metal Workers Int'l Assoc., Local Union 20 v. Horning Invs., LLC*, 828 F.3d 587, 594 (7th Cir. 2016) (no scienter where "there is enough ambiguity" surrounding regulations "that we cannot infer that Horning either knew or must have known that it was violating the Davis-Bacon Act"); *United States ex rel. Smith v. The Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016) ("Even if we assume that the 737NG aircraft Boeing sold to the government didn't comply with FAA regulations, there are simply no facts in the record supporting the relators'

32

contention that Boeing *knew* about the nonconformities when submitting the claims for payment."); *Southeastern Carpenters Reg'l Council*, 2016 WL 4158392, at *11 ("Even assuming that Defendants inaccurately certified their compliance with the DBRA, [k]nowledge is not shown by simply saying . . . that Defendants are saying something that is not true."). Relators' failure to present evidence establishing ASI's knowledge that its representations about DBE requirements were allegedly false and its knowledge that those representations were allegedly material requires that summary judgment be granted.

**V.      ASI Is Entitled To Summary Judgment On Relators' Claim For Actual Damages.**

The FCA was intended to punish fraud "that might result in *financial loss* to the Government." *Carlson v. DynCorp Int'l, LLC*, 657 F. App'x 168, 170 (4th Cir. 2016) (emphasis added). To recoup such losses, the FCA authorizes an award of three times "the amount of damages which the Government sustains because of the act" of the FCA violator. 31 U.S.C. § 3729(a). Courts use two primary analyses to measure the government's damages caused by an FCA violation. *See e.g., Harrison II*, 352 F.3d. Relators have no evidence to support an award of damages under either analysis.

Where the government receives something of value, actual damages are "the amount of money the government paid by reason of the false statement above what it would have paid absent the false statement." *Harrison II*, 352 F.3d at 922-23 ("[T]he district court properly required the [relator] to prove damages by showing how much more the government paid [the subcontractor] to perform the subcontract than it would have paid another firm absent the false no-OCI certification."). "Where a contractor's fraud consists of knowingly submitting nonconforming goods with ascertainable market value, the Supreme Court has instructed that '[t]he Government's actual damages are equal to the difference between the market value of the [product] it received and retained and the market value that the [product] would have had if [it] had been of the specified quality.'" *Science Applications*, 626 F.3d at 1278-79. "But if the value that conforming goods or

services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used." *Id.* at 1279.

On the other hand, where "there is no tangible benefit to the government and the intangible benefit is impossible to calculate" some courts have found disgorgement of the entire value of the contract to be an appropriate measure of actual damages. *See, e.g.*, *United States ex rel. Longhi,* 575 F.3d 458, 473 (5th Cir. 2009); *Harrison II*, 352 F.3d at 923 n.17 (acknowledging that "factual scenarios could exist in which the contractor's performance so lacks any value as to make recovery of all monies paid by the government an appropriate remedy"). Disgorgement is available "only where the government proves that it received no value from the product delivered." *Science Applications*, 626 F.3d at 1279 (citing *Harrison II*, 352 F.3d at 923 & n.17).

Relators have presented no evidence that the United States received "no tangible benefit" as a result of ASI's performance of the Contract and thus they cannot pursue disgorgement. It is undisputed that ASI, the lowest bidder, completed the Contract to clean and paint the Severn River Bridge. The MSHA conducted a final inspection of the bridge, and approved of ASI's work. The government got exactly what it paid for—a cleaned and painted bridge for the price of approximately $10,000,000. This case is analogous to those in which courts have concluded that—even assuming a false certification occurred—the United States received something of value, and thus is not allowed to recover damages equal to all payments under the contract. *See Harrison II*, 352 F.3d at 923 (district court correctly "disallowed [Relator] from recovering disgorgement of all $9 million that the government paid for the subcontracted work" when relator "presented no evidence that the government did not get what it paid for"); *United States ex rel. Wall v. Circle C Constr., LLC*, 813 F.3d 616, 618 (6th Cir. 2016) ("In determining actual damages, however, the relevant question is not whether in some hypothetical scenario the government would have withheld

34

payment, but rather, more prosaically, whether the government in fact got less value than it bargained for."); *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 840 (D.C. Cir. 2012); *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 & n.7 (Fed. Cl. 1994).

Relators also cannot prevail on a claim for damages based on a benefit-of-the-bargain theory, because they have no evidence upon which a reasonable jury could conclude that the goods and services the United States received are worth less than the amount it paid ASI under the Contract. Although Relators have asserted that the DOT "funded the Contract to advance the government objective of creating more opportunities for small minority and woman-owned business" (Dkt. 98 at 11), they have no evidence to support that allegation. As explained above, the undisputed evidence is that the DOT did not know—much less condition payment on—whether the Contract even included a DBE participation goal. More importantly, Relators have no evidence showing any difference to the United States in the value of the work performed under the Contract depending on whether the DBE participation goal was satisfied. In the absence of any such evidence, Relators have no way to prove their claim for damages and ASI is entitled to summary judgment.

## VI.    ASI Is Entitled To Summary Judgment On Relators' Conspiracy Claim.

A conspiracy claim under the FCA "rises and falls with the individual claims." *United States ex rel. Godfrey v. KBR Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010). Because Relators have not presented facts upon which a reasonable jury could conclude that ASI violated the FCA, they cannot prove that ASI conspired to commit any such violation. *See* 31 U.S.C. § 3729(a)(3). Accordingly, ASI is entitled to summary judgment on Relators' conspiracy claim for all of the reasons set forth in this Memorandum.

## <u>CONCLUSION</u>

For all the foregoing reasons, ASI respectfully requests that the Court grant its Motion to for Summary Judgment and dismiss Relators' Third Amended Complaint in its entirety, with prejudice.

US.113714382.01

Dated:  August 18, 2017          Respectfully submitted,

DEFENDANT ABHE & SVOBODA, INC.


By:*/s/ Ava E. Lias-Booker*_____
Ava E. Lias-Booker (Fed. Bar No. 05022)
MCGUIRE WOODS LLP
7 St. Paul Street, Suite 1000
Baltimore, MD 21202-1671
Tel: (410) 659-4430
Fax: (410) 659-4558
alias-booker@mcguirewoods.com


By:*/s/ James L. Volling*_____
James L. Volling (*admitted pro hac vice*)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
james.volling@FaegreBD.com

*Attorney for Defendant Abhe & Svoboda, Inc.*

36

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that on, August 18, 2017, a copy of the

foregoing **Memorandum In Support of Motion for Summary Judgment** was filed electronically

via the Court's CM/ECF system.  Notice of this filing will be sent to the following by operation of

the Court's electronic filing system:


Elkin L. Kistner, Esq.
Bick & Kistner
101 South Hanley Road, Suite 1280
St. Louis, MO 63105
<u>elkinkis@bick-kistner.com</u>

Joseph V. Neill, Esq.
5201 Hampton Avenue
St. Louis, MO 63109

Gerard P. Martin
Rosenberg Martin Greenberg, LLP
25 S. Charles Street, Suite 21201
Baltimore, MD 21201
<u>gmartin@rosenbergmartin.com</u>

*Counsel for Relators, Joseph M.
Hedley and Fred A. Rauch, III*


By:  <u>/s/ James L. Volling</u>

37