## 8IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

UNITED STATES OF AMERICA, )
ex rel. JOSEPH M. HEDLEY and )
FRED A RAUCH, III, )
 )
  Plaintiffs, )
 )
v. )  Civil Action No. 1:14-cv-02935-RDB
 )
ABHE & SVOBODA, INC., )
 )
  Defendant. )

## OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

 Plaintiff, the United States of America, by and through qui tam Relators, Joseph M. Hedley and Fred A. Rauch, III (collectively, "Relators"), by their undersigned counsel, submit this Opposition to the Motion for Summary Judgment ("Motion") filed by Defendant, Abhe & Svoboda ("ASI" or "Defendant").  The grounds and authorities in support of this Opposition are set forth in the accompanying memorandum, which is incorporated herein by reference.[1]

       Respectfully submitted,

       */s/ Gerard P. Martin*
       Gerard P. Martin, Bar No. 00691
       Harris W. Eisenstein, Bar No. 29694
       Rosenberg Martin Greenberg, LLP
       25 S. Charles Street, 21st Floor
       Baltimore, Maryland  21201
       (410) 727-6600 (phone)
       (410) 727-1115 (facsimile)
       gmartin@rosenbergmartin.com
       heisenstein@rosenbergmartin.com

---

[1] In further support of its Opposition, Relators submit the accompanying Appendix of Exhibits, which contains a copy of all exhibits and affidavits referenced herein.

Elkin L. Kistner (*pro hac vice*),
Bar No. 802448
101 South Hanley Road, Suite 1280
St. Louis, Missouri  63105
(314) 571-6823 (phone)
(314) 727-9071 (facsimile)
elkinkis@kick-kistner.com

Joseph V. Neill (*pro hac vice*),
Bar No. 802445
5201 Hampton Avenue
St. Louis, Missouri  63109
(314) 353-1001 (phone)
(314) 353-0181 (facsimile)
Neill5300@aol.com

*Attorneys for Relators,*
*Joseph M. Hedley and Fred A. Rauch, III*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

FACTS ...................................................................................................................... 2

    I.     MSHA advertises the Severn River Bridge Project ................................... 2

    II.    The DBE program ..................................................................................... 3

    III.   ASI develops the fraudulent scheme ......................................................... 5

    IV.   ASI submits its false bid for the Contract.................................................. 7

    V.    MSHA awards the Contract to ASI ........................................................... 7

    VI.   Work on the Severn River Bridge Project ................................................. 9

        A.  The subcontract between ASI and NWSB ......................................... 9

        B.  ASI negotiates for and purchases materials in NWSB's name.......... 10

        C.  ASI and Brighton hire employees from the local union to complete work in NWSB's name ................................................................... 13

        D.  ASI submits false information to MSHA regarding DBE compliance ............ 16

    VII.  ASI receives payment from MSHA ........................................................ 18

STANDARD .......................................................................................................... 18

SUMMARY OF ARGUMENT ............................................................................. 19

ARGUMENT ......................................................................................................... 20

    I.     ASI made numerous overt false claims for payment.................................20

        A.  The Contract itself was obtained through overt fraudulent inducement ....................................................................................... 20

        B.  ASI continued to make false and fraudulent claims throughout the course of the Contract................................................................... 23

    II.    The implied certification theory supports Relators' FCA claims.............24

i

III.    ASI's continued falsehoods were material to the United States' payment of claims ..................................................................................26

IV.    The evidence demonstrates that ASI "knowingly" submitted false statements in seeking payment ............................................................28

V.    Disgorgement of all payments received by ASI is the appropriate measure of damages ........................................................................30

VI.    Relators' conspiracy claim survives summary judgment .......................34

CONCLUSION .......................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)..........................................19

*Antonio v. Sec. Services of Am., LLC*, 701 F. Supp. 2d 749, 758 (D. Md. 2010).........................19

*Fairclough v. Bd. of County Com'rs of St. Mary's County, MD,*
244 F. Supp. 2d 581, 585 (D. Md. 2003) .................................................................19

*Harrison v. Westinghouse Savannah River Co. ("Harrison I"),*
176 F.3d 776, 787 (4th Cir. 1999) ...........................................................20, 23, 28, 29

*Kitchen v. Upshaw*, 286 F.3d 179, 182 (4th Cir. 2002).................................................18

*Magill v. Gulf & Western Industries, Inc.*, 736 F.2d 976, 979 (4th Cir. 1984) ..............................19

*Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) ...........................................19

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
131 S.Ct. 1885, 1893–94, 179 L.Ed.2d 825 (2011) ...................................................20

*Snyder v. Chester County Mut. Ins. Co.*, 264 F. Supp. 2d 332, 336 (D. Md. 2003)....................18

*United States. ex rel. Elms v. Accenture, LLP*, 341 Fed. Appx. 869, 872 (4th Cir. 2009) ............21

*United States ex rel. Garzione v. PAE Gov't Services, Inc.,*
670 Fed. Appx. 126, 127 (4th Cir. 2016)...............................................................25

*United States ex rel. Harrison v. Westinghouse Savannah River Co. ("Harrison II"),*
352 F.3d 908 (4th Cir. 2003) ............................................................................31

*United States ex rel. King v. F.E. Moran 2002 WL 2003219 (N.D. Ill. Aug. 29, 2002)*...............33

*United States ex rel. Laymon v. Bombardier Transp. (Holdings) USA,*
2009 WL 793627 (W.D. Pa. March 23, 2009)........................................................32, 33

*United States ex rel. Laymon v. Bombardier Transp. (Holdings) USA,*
656 F. Supp. 2d 540 (W.D. Pa. 2009) ................................................................32, 33

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009) ....31, 32

*United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943) .....................................20, 21, 22

*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.,*
838 F.3d 750, 761 (6th Cir. 2016) .......................................................................25

*United States ex rel. Rostholder v. Omnicare, Inc.*, CIV. CCB-07-1283,
  2012 WL 3399789 (D.Md. Aug. 14, 2012), aff'd, 745 F.3d 694 (4th Cir. 2014) ......................29

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
  525 F.3d 370, 376 (4th Cir. 2008) .....................................................................21, 23

*United States v. Anghaie*, No. 15-10454, 2015 WL 7720313, at *5 (11th Cir. Nov. 30, 2015) ...32

*United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988).........................................33, 34

*United States v. Neifert–White Co.*, 390 U.S. 228, 233 (1968) ....................................................23

*United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) .........................................................31

*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) ..........25

*United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017) ..........................25, 26, 27, 29

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016) ..........................................................24, 25, 26, 29

Rules

Fed. R. Civ. Pro. 56(c)(1)(A)........................................................................................................19

Statutes and Regulations

31 U.S.C. § 3729 *et seq.* ................................................................................................................1

31 U.S.C. § 3729(b) ....................................................................................................................29

49 C.F.R. § 26.1 *et seq* ....................................................................................................................3

49 C.F.R. § 26.13(b) ..................................................................................................................5, 27

49 C.F.R. § 26.37(b) ..................................................................................................................3, 27

49 C.F.R. § 26.45 ...........................................................................................................................3
49 C.F.R. § 26.51 ...........................................................................................................................3

49 C.F.R. § 26.53 ...........................................................................................................................3

49 C.F.R. § 26.55(a) ...................................................................................................................3, 24

49 C.F.R. § 26.55(c) ..............................................................................................................4, 24, 31

49 C.F.R. § 26.107 .........................................................................................................................5

## INTRODUCTION

This case arises out of ASI's calculated scheme to defraud the United States and the Maryland State Highway Administration ("MSHA"), and undermine the United States Department of Transportation's ("DOT") Disadvantaged Business Enterprise ("DBE") program.  Beginning with ASI's initial bid for Contract No. AA4565180 ("Contract") in June 2006, ASI repeatedly and intentionally made false representations, certifications and claims to MSHA regarding its alleged compliance with the contractual requirement that a DBE complete at least fifteen percent (15%) of work under the Contract.  ASI took extraordinary measures to conceal the fact that all work it had purportedly subcontracted to a DBE, Northeast Work and Safety Boats, LLC ("NWSB"), was not actually performed by NWSB.

ASI's fraud induced MSHA to award the Contract to ASI.  And, ASI's continued representations and certifications of compliance with the Contract's DBE participation goal caused MSHA to submit claims for the payment of federal funds to DOT, which in turn released such funds to MSHA.  Had MSHA and DOT discovered the fraud in progress, all claims for payment would have been denied.  Indeed, the Contract expressly sought to advance the objectives of DOT's DBE program, not to confer a financial benefit on a prime contractor and its illegitimate DBE subcontractor.

The elaborate scheme employed by ASI is a classic case of DBE fraud in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").  In requesting summary judgment, ASI ignores a mountain of documentary and testimonial evidence confirming that Relators' claims are factually and legally supportable.  ASI also grossly distorts deposition testimony to support its misplaced arguments.  At the very least, there is a genuine dispute of material fact concerning

whether ASI's unscrupulous conduct violated the FCA.  For the reasons set forth below, ASI's Motion should be denied.

## FACTS

**I.      MSHA advertises the Severn River Bridge Project.**

On or about April 25, 2006, MSHA sought bids on a Contract to clean and repaint of the Pearl Harbor Memorial Bridge, popularly known as the Severn River Bridge (the "Severn River Bridge Project").  The Federal Highway Administration ("FHWA"), an operating administration of DOT, financed the Contract because it advanced the foundational objective of DOT's DBE program: helping businesses owned and controlled by socially and economically disadvantaged individuals, including minorities and women, to fairly compete for contracting opportunities.  Ex. 1, p. 1.

Specifically, the Contract included a fifteen percent (15%) DBE participation goal.  *Id.* The Contract further provided that the low bidder "shall" submit an Affirmative Action Plan acceptable to MSHA which identifies the DBE contractors that will satisfy the DBE participation goal, including, at a minimum, a "Schedule for Participation of DBE/MBE (Form OOC44)" and a "Disadvantaged Business Enterprise Project Disclosure and Participation Certificate (Form OOC45)," or, if the "proposed DBE participation does not meet the DBE contract goals," the low bidder must submit "information sufficient to demonstrate that the bidder has made good faith efforts to meet these goals[.]"  *Id.* at § B.  The Contract also provided that a bidder unable to secure DBE "commitments which at least equal the appropriate percent (goal) of the values of the prime Contract… shall request, in writing, a waiver of the unmet portion of the goal."  *Id.*

ASI did not seek a waiver of the 15% DBE participation goal, nor did it even attempt to demonstrate to MSHA that, despite its best efforts, it had fallen short of that goal.  Instead, ASI

repeatedly represented to MSHA that it intended to, and did, satisfy the goal by using NWSB as its DBE subcontractor.  *See infra* Arg. §§ V and VI(D).

## II.        The DBE program.

DOT's implementing regulations concerning its DBE program (49 C.F.R. § 26.1 *et seq.*) "appl[ied] to" the Contract.  Ex. 1, p. 1.  The regulations advance objectives central to the success of DBEs, including "creat[ing] a level playing field on which DBEs can compete fairly for DOT–assisted contracts," "help[ing] to remove barriers to the participation of DBEs in DOT–assisted contracts," and "assist[ing] the development of firms that can compete successfully in the marketplace outside the DBE program."  49 C.F.R. § 26.1.  The regulations therefore require each state administering DOT-funded contracts to establish overall and contract-specific goals for DBE participation.  *Id.* at §§ 26.45, 26.51.  Individual contract goals, however, become mandatory when a contract is awarded.  *Id.* at § 26.53.

To safeguard the proper distribution of federal funds, all recipient states, including Maryland, must include in their DBE program "a monitoring and enforcement mechanism to ensure that work committed to DBEs at contract award or subsequently (e.g., as the result of modification to the contract) is actually performed by the DBEs to which the work was committed."  *Id.* at § 26.37(b); *see also id.* at § 26.55(a) ("When a DBE participates in a contract, you count only the value of the work actually performed by the DBE toward DBE goals.").  At bottom, expenditures to a DBE contractor only count toward a DBE contract goal if the DBE contractor performs a "commercially useful function," defined as follows:

> A DBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, **and** supervising the work involved. To perform a commercially useful function, the DBE must also be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining

quality and quantity, ordering the material, **and** installing (where applicable) and paying for the material itself.

\*\*\*

A DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation.

*Id.* at § 26.55(c) (emphasis added).

Robert C. Ashby, the former Deputy Assistant General Counsel for Regulation and Enforcement at DOT and the principal drafter of every DOT DBE regulation from 1979 to 2012, testified that determining whether a DBE performs a commercially useful function hinges on "the reality on the ground of who's actually running the show." Ex. 2 ("Ashby Dep."), 73:19-20. The regulations prohibit "a situation where the DBE is dependent on financing, or expertise, or equipment, or other facilities" provided by the prime contractor such "that the DBE and its work on that particular project isn't viable without that assistance." *Id.* at 76:7-11. In practice, DOT uses the "umbilical cord test: If you cut off that umbilical cord, is the DBE going to be viable on that project[?]" *Id.* at 76:12-13. If the DBE is nothing more than "the pet of the prime contractor," or an "extra participant" on the job merely "to get DBE credit, not to do real work," the DBE is not performing a commercially useful function and its work cannot be counted toward a contract's DBE goal. *Id.* at 75:20-77:7; 36:13-37:14; 68:23-72:10; 81:6-18.

Under DOT's regulations, every contract between a recipient state and a contractor "must include" the "assurance" that the "contractor shall carry out applicable requirements of 49 CFR part 26 in the award and administration of DOT–assisted contracts. Failure by the contractor to carry out these requirements is a material breach of [the] contract, which may result in the termination of [the] contract or such other remedy as the recipient deems appropriate, which may include, but is not limited to: (1) Withholding monthly progress payments;…" 49 C.F.R. §

26.13(b).[2]  Consistent with this mandate, the Contract provides that any non-compliant contractor is subject to sanctions including, without limitation, "withholding payment or a percentage thereof, pending correction," "debarment," "criminal prosecution," or "[a]ny other action as appropriate." Ex. 1, § D.  These harsh sanctions protect and "promote the purpose of the MDOT DBE/MBE Program." *Id.*

### III.        ASI develops the fraudulent scheme.

In search of a DBE subcontractor to include in its bid for the Contract, ASI contacted NWSB in May 2006.  Ex. 3 ("Casey Dep."), 27:10-15; 78:11-79:1.  On May 23, 2006, NWSB, through Jack Casey, sent ASI a copy of its Maryland DBE certification.  Ex. 4.  The certification permitted NWSB "to do business with the Maryland Department of Transportation, State of Maryland, as a MBE/DBE in the following area(s):

> WATER TRANSPORTATION SERVICES, NEC (BARGE, DIVE SUPPORT VESSELS, INSPECTION ACCESS EQUIPMENT, TRI-HULL SAFETY BOATS, WORK PLATFORMS AND BARGES RENTAL OR LEASING WITH DRIVER AND DIVER, CANAL BARGE TRANSPORTATION).

*Id.* at p. 2 (emphasis in original).

On May 24, 2006, ASI faxed to NWSB specifications received from the Maryland Department of Transportation ("MDOT") regarding the "Engineers Boat" required for the Severn River Bridge Project.  Ex. 5.  Responding to ASI on May 29, 2006, NWSB submitted a proposal for the engineer's boat as well as an "equipment bid" quoting the cost for NWSB to provide barges, tugs, an inspection boat, and a safety boat.  Ex. 6.

---

[2] Contractors who falsify compliance with the DBE program are subject to even stiffer penalties, such as suspension or debarment.  49 C.F.R. § 26.107.

Despite NWSB's proposal to provide limited DBE services, ASI, through Gail Svoboda, convinced NWSB to join ASI's bid for the Contract as its only DBE subcontractor.  Ex. 7.  Prior to reaching an agreement with NWSB, ASI had struggled to secure a DBE subcontractor to include in its bid for the Contract.  Ex. 8 ("Hedley Aff."), ¶¶ 6-7 .  The ASI-NWSB agreement allowed ASI to represent to MSHA, in its bid for the Contract and thereafter, that NWSB would satisfy the Contract's 15% DBE participation goal (Ex. 7) when, in fact, NWSB would do nothing more than "[l]end their name and be a flow-through."  Ex. 9 ("Hedley Dep."), 81:3-7; 97:3-21 (same).

Mr. Svoboda revealed the ASI-NWSB scheme to Mr. Hedley in a telephone conversation in August or September 2006.  *Id.* at 81:3-15.  This arrangement, however, was in place before ASI bid for the Contract.  Hedley Aff., ¶¶ 6-7.  Mr. Svoboda explained to Mr. Hedley that ASI's deal with NWSB was:

- ASI would use NWSB's name and DBE certification to make it appear that ASI intended to and did comply with the Contract's 15% DBE participation goal. *Id.* at ¶ 7; Ex. 10, p. 2.  In practice, however, ASI and Relators' company, Brighton Painting Company ("Brighton"), would complete all work purportedly subcontracted to NWSB.  *See infra* Arg. § VI(B)-(C).
- NWSB would not actually perform, manage and supervise work under the Contract.  Hedley Aff., ¶ 8; Ex. 10, p. 2.  Instead, ASI and Brighton would hire employees from the local union, place them on NWSB's payroll, supervise their work, and front payment for their salaries to make it appear that NWSB had performed the work.  *See infra* Arg. § VI(C).
- With respect to materials and supplies, NWSB would not negotiate prices, determine quality and quantity, order the material, and install and pay for the material itself.  Hedley Aff., ¶ 9; Ex. 10, p. 2.  Rather, ASI would negotiate all purchases, inspect the quality of the product ordered, direct suppliers to invoice NWSB, and front money to NWSB to create the appearance that NWSB had acquired the materials and supplies for the job.  *See infra* Arg. § VI(B).
- In return for lending ASI its name and DBE certification, NWSB was guaranteed an eight percent (8%) markup on all materials purchased through and payroll processed under NWSB's name.  Hedley Dep., 102:15-103:1 (NWSB "didn't do any work but they got an 8 percent markup on what we said they did"); Hedley Aff., ¶ 10; Ex. 11 ("G.Svoboda Dep."), 117:19-25 (confirming the 8% markup); Casey Dep., 96:18-97:11 (same); 103:19-104:9 (same).

Brighton Painting Company's dire financial condition left Mr. Hedley with no choice but to participate in the scheme ASI and NWSB had concocted.  Hedley Dep., 82:25-83:20.[3]

IV.      **ASI submits its false bid for the Contract.**

On June 15, 2006, ASI submitted its bid for the Contract to MSHA.  ASI's bid included a Schedule of Participation in which ASI, through Gail Svoboda, made the following certification regarding the Contract's DBE participation goal:

> 1.  [X] I certify that I/we intend to achieve the goal stated in this contract and will use the MDOT certified MBE/DBE subcontractors/suppliers listed in Part II to accomplish this goal.

Ex. 7, p. 1.  In Part II of the Schedule of Participation, ASI certified that NWSB would serve as the only DBE subcontractor and would handle 15.16% of the work under the Contract, or $1,569,200.00 of ASI's $10,381,640.00 bid.   *Id.* at pp. 1-2.  ASI described the DBE work designated for NWSB as "work platforms, work boats, and engineer's boat."  *Id.* at p. 2.  ASI did not disclose to MSHA that it never intended for NWSB to perform this work.

V.      **MSHA awards the Contract to ASI.**

On June 15, 2006, MSHA notified ASI that it had submitted the lowest bid for the Contract. Ex. 12.  But before it would award the Contract to ASI, MSHA required that ASI submit its Affirmative Action Plan.  *Id.*

ASI provided two documents to MSHA in support of its Affirmative Action Plan on or about June 20, 2006.  In the first submission, titled Schedule for Participation of DBE/MBE, ASI

---

[3] ASI became a creditor of Brighton, its owners (Joseph M. Hedley and Fred A. Rauch, III), and related entities long before the Severn River Bridge Project began.  Hedley Aff., ¶ 3.  The parties ultimately agreed that Brighton could repay its debt by managing various projects for ASI and applying profits derived from those projects to pay down the debt.  *Id.* at ¶ 4.  The Severn River Bridge Project was one such project.  *Id.* at ¶ 5.  Had Brighton refused to participate in the Severn River Bridge Project, ASI would have forced Brighton's immediate demise.  *Id.* at ¶ 11.

certified that it would use NWSB as the "DBE/MBE firm involved in this project" and subcontract $1,569,200.00 of work under the Contract to NWSB to satisfy the 15% DBE participation goal. Ex. 13.  The second submission, titled Disadvantaged/Minority Business Enterprises (DBE/MBE) Disclosure and Participation Certificate, restated NWSB's role as ASI's sole DBE subcontractor. Ex. 14.  Specifically, the Disclosure certified that NWSB "is prepared to perform" work and services described as "Engineers Boat, Safety Rigging" at a cost of $1,569,200.00.  *Id.*  The Disclosure further provided that neither ASI nor NWSB had "any Oral or Written Agreement(s) or Understanding(s) with Non-DBE/MBE Persons or Firms Relating to Assistance, Financial or Otherwise, to be Provided by Said Persons or firms."  *Id.*  NWSB, through its Managing Member Linda Casey, certified that it "will enter into a Written Contract with Abhe & Svoboda, Inc. for the Work/Service indicated above upon the Prime contractor's [ASI's] execution of a Contract with the State Highway administration."  *Id.*  In executing the Disclosure, ASI, through Gail Svoboda, "agree[d] with the terms and conditions" therein.  *Id.*

Relying on the certifications in ASI's bid and Affirmation Action Plan, MSHA awarded the Contract to ASI.  MSHA would not have awarded the Contract to ASI had MSHA known that ASI's bid and Affirmative Action Plan contained false information regarding NWSB's participation as a DBE and, accordingly, ASI's ability or intent to meet the Contract's DBE goal. Ex. 15 ("Dade Aff."), ¶ 4.  Similarly, had MSHA discovered the ASI-NWSB ruse during the term of the Contract, MSHA would not have submitted claims for payment to DOT (*id.* at ¶ 5), DOT would not have released federal funds to MSHA (Ex. 16 ("Ashby Aff."), ¶ 5), and MSHA would not have paid such funds to ASI.  Dade Aff., ¶ 5.

VI.        **Work on the Severn River Bridge Project.**

The Severn River Bridge Project included two major components: (i) installing and demobilizing rigging, containment and scaffolding equipment and platforms to facilitate cleaning and painting the bridge; and (ii) actually cleaning and painting the bridge. ASI represented to MSHA that it would and did satisfy the Contract's DBE participation goal by subcontracting the former category of work to NWSB as well as responsibility for procuring all materials and supplies needed to complete such work.

A.        *The Subcontract between ASI and NWSB.*

ASI and NWSB entered into a Subcontractor Agreement dated October 10, 2006 ("Subcontract). Ex. 17. The Subcontract provides that NWSB's compensation would total $1,569,200.00, which represented 15.16% of the work under the Contract. *Id.* at p. 23. The Subcontract does not mention any additional compensation due from ASI to NWSB. However, Mr. Hedley, Mr. Svoboda and Mr. Casey all agreed that ASI guaranteed NWSB an 8% markup on the $1.5 million committed to NWSB. Hedley Dep., 102:15-103:1; G.Svoboda Dep., 117:19-25 (confirming that ASI "guarantee[d] him [NWSB] a markup of $120,000 on a subcontract price of one and a half million", or "8 percent"); Casey Dep., 96:18-97:11 (NWSB received a markup on "everything in the [sub]contract" with ASI"); *id* at 103:19-104:9 (confirming the 8% markup); *id.* at 117:10-118:17 (same). According to Mr. Svoboda, "My Agreement with Jack [Casey] is that we [ASI] would guarantee him a markup of $120,000 on a subcontract price of $1.5 million." Ex. 18, p. 1; *see also* Ex. 19 (Mr. Svoboda again confirming the guaranteed 8% markup).

The Subcontract specifically described NWSB's work as follows:

| ITEM NO. | ITEM DESCRIPTION | UNIT | EST QTY | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 11025 | Engineer's Boat | LUMP | LUMP | $41,600.00 | $41,600.00 |
| 492585 (partial) | Engineer, Furnish, Install, and Move Quick Deck Scaffolds at Piers, Safespan Platforms between Piers, Debris Containment Tarpaulins, Aluminum Scaffold Planks, Ladders and all other Equipment and Materials Required to Provide Access to Contractor for Containment of Debris, Cleaning and Painting Bridge | LS | 1 | $1,527,600.00 | $1,527,600.00 |
| | | | | TOTAL | $1,569,200.00 |

Ex. 17, p. 23.  The Subcontract also obligated NWSB to "take all measurements and provide all drawings and submittals required for Work performed by Subcontractor."  *Id.*

In other words, NWSB's responsibilities included procuring the platforms, scaffolding, containment tarps, and related equipment and materials, and then installing those materials such that laborers could clean and paint the Severn River Bridge.  Mr. Svoboda and Mr. Casey referred to the work subcontracted to NWSB as the rigging and containment portion of the Contract. G.Svoboda Dep., 38:12-23; Casey Dep., 54:1-11.

> B.      *ASI negotiates for and purchases materials in NWSB's name.*

ASI's President, Gail Svoboda, took great caution to conceal the fact that ASI, not NWSB, negotiated the price of the materials used on the Contract, determined the quality and quantity of such materials, and ordered and paid for them.  His deception manifested in negotiating with suppliers but instructing them to invoice NWSB, then reassuring suppliers that ASI would guarantee payment, and finally fronting money to NWSB to cover the cost of purchases ASI had made in NWSB's name.  G.Svoboda Dep., 143:23-144:15.  Mr. Svoboda's efforts made it appear, on paper, that NWSB had acquired materials for the Contract and, thus, allowed ASI to claim DBE credit for such purchases.

Perhaps the best example of ASI's artifice is the purchase of the Safespan products used in supporting the rigging and containment work.   On September 18, 2006, weeks before the Subcontract was executed, Mr. Svoboda emailed David Malcolm, the Vice President of Safespan Platform Systems, Inc., to confirm that he intended to purchase Safespan under NWSB's name:

> We will be using a Northeast Works and Safety Boats, LLC, a DBE Subcontractor, to furnish and install the Safespan for the Severn River Project, so the purchase for those materials will come from him.   However, I will guarantee payment for the materials ordered for this Project.
>
> ***
>
> I will get back to you in a week or two regarding our needs for the Severn River Project, so don't bother Northeast Works and Safety Boats, LLC about that order. They have not yet seen the drawings, and will not know what materials they will need until we get the drawings.

Ex. 20, p. 2.

Two days later, Mr. Malcolm "thank[ed]" Mr. Svoboda "for the future order you will be placing through Northeast Works and Safety [Boats], LLC."   *Id.* at p. 1.   While NWSB was not involved in these negotiations (Ex. 21 ("Malcolm Dep."), 26:15-20; 27:19-22), that same day, at the direction of Mr. Svoboda, Mr. Malcolm faxed an invoice to NWSB with the notation that he would be "forwarding a copy of this invoice" to Mr. Svoboda and that Mr. Svoboda "said he would arrange the 30% deposit to [be] over[-]nighted to us for Friday delivery."   Ex. 22.   Mr. Svoboda then sent the deposit, plus NWSB's guaranteed 8% markup, to NWSB so that it could pay Safespan.   G.Svoboda Dep., 139:14-140:23; *see also id.* at 165:2-167:16 (confirming that Safespan invoiced NWSB, NWSB then invoiced ASI adding the 8% markup, ASI then paid NWSB, and NWSB then paid Safespan); Ex. 23 (copies of Safespan's invoices to NWSB and NWSB's invoices to ASI with the 8% markup).

Following this same practice, on October 30, 2006, Mr. Svoboda ordered additional materials from Safespan and instructed Mr. Malcolm to fax the new invoice to both ASI and NWSB.  Ex. 24; G.Svoboda Dep., 140:24-141:10.  Mr. Malcolm followed orders, sending Linda Casey, the sole member of NWSB and Jack Casey's wife, "2 new invoices for additional materials that Gail has ordered" and informing her that "Gail will be contacting you as to how much to send us hopefully at some point today."  Ex. 25; *see also* Malcolm Dep., 50:14-17 (Gail Svoboda, not NWSB, placed this order).

Months later, Mr. Svoboda negotiated a settlement regarding improperly manufactured Safespan product he had ordered in NWSB's name.  Ex. 26.  Again, NWSB was not involved in the negotiations.  Malcolm Dep., 54:3-55:20.  In fact, Mr. Malcolm testified that all negotiations were between him and Mr. Svoboda (*id.* at 27:19-22; 56:11-22); that Mr. Svoboda placed all orders in NWSB's name (*id.* at 29:18-22; 46:21-47:4; 48:7-11; 50:14:17); and that, in fact, Mr. Malcolm has never negotiated with, spoken to or met anyone at NWSB (*id.* at 26:15-20; 69:17-70:21).

The pattern of Mr. Svoboda negotiating deals with suppliers and making payment through NWSB continued throughout the Contract.  The evidence is indisputable:

- Mr. Svoboda struck a deal with Kirk Beeche of Safway Services, Inc. ("Safway") to purchase more than $100,000 of QuikDeck scaffolding in NWSB's name.  Mr. Svoboda decided to purchase QuikDeck based on the recommendation of Paul Marley, a former Brighton employee and the General Superintendent for the Severn River Bridge Project, and with no involvement from NWSB.  G.Svoboda Dep., 147:20-148:10; Ex. 27 ("Marley Dep."), 184:17-21.  Safway sent its initial quote for the QuikDeck purchase to ASI, but changed the customer name to NWSB following a conversation with Mr. Svoboda.  Ex. 28; G.Svoboda Dep., 150:7-151:1.  After ordering the QuikDeck, Mr. Svoboda advanced payment to NWSB plus the guaranteed 8% markup, which allowed NWSB to pay Safway.  Exs. 29-30.  And, when Safway tried to charge NWSB more than what it had agreed to charge ASI, Mr. Svoboda intervened, instructed Mr. Beeche to reduce the pricing, and confirmed, "[o]nce I have reviewed the components and the prices, I will pay Northeast so that Northeast can pay you."  Ex. 31.

- Although NWSB "was responsible for the engineering" under its Subcontract with ASI, NWSB "did not do any engineering."  G.Svoboda Dep., 126:17-127:22.  In fact, several months before the Subcontract was executed, Mr. Svoboda engaged Jim Klino of JLK Engeneuring, Inc. ("JLK") to provide engineering services.  *Id.* at 155:17-157:4.  After telling Mr. Klino how he intended to complete the job (*id.*; Ex. 32), Mr. Svoboda reviewed Mr. Klino's preliminary plans and demanded one critical change: "On all sheets, delete 'Abhe & Svoboda, Inc.' from the title block and insert 'Northeast Work & Safety Boats, LLC' in its place."  Ex. 33, p. 1.  JLK made this modification even though ASI did not have a contract with NWSB at that time.  G.Svoboda Dep., 157:19-25.  Mr. Casey also had no knowledge of this transaction.  Casey Dep., 196:19-197:6.  Tellingly, when asked to describe NWSB's input on the engineering services, Mr. Svoboda testified, "Probably not a lot."  G.Svoboda Dep., 159:13-20; 133:2-15 (conceding that JLK took all measurements and provided all drawings required for work subcontracted to NWSB).
- ASI ordered a vessel inspection through A.R. Jordan & Company and paid for these services by advancing funds to NWSB, plus the guaranteed 8% markup.  G.Svoboda Dep., 160:1-162:2; Ex. 34.
- As the sole decision-maker of "what components to purchase," Mr. Svoboda bought conveyor belts from Sparks Belting Company ("Sparks") under NWSB's name.  G.Svoboda Dep., 181:16-19; Ex. 35.  Sparks invoiced ASI for this purchase, but Mr. Svoboda crossed out ASI's name on the invoice and inserted NWSB in its place.  G.Svoboda Dep., 181:20-183:6; Ex. 35, pp. 3-4; Ex. 36 (Sales Order to ASI, listing the customer as "Gail S").  ASI then wired funds to NWSB with instructions to pay Sparks.  G.Svoboda Dep., 186:8-187:3; Ex. 37.
- ASI, not NWSB, decided to have Schemer Steel Fab fabricate certain materials for the Severn River Bridge Project and processed that transaction through NWSB.  G.Svoboda Dep., 190:17-22.
- ASI also "fronted the money for" wire rope purchased in NWSB's name from Atco Wire Rope & Industrial Supply, Inc.  *Id.* at 191:9-193:17; 195:6-18.

Put simply, despite the terms of its Subcontract with ASI, NWSB did not "engineer" and "furnish" the materials and equipment needed for the rigging and containment work, nor did NWSB "take all measurements and provide all drawings and submittals required for Work performed by Subcontractor."  *See* Ex. 17, p. 23.

       C.     *ASI and Brighton hire employees from the local union to complete work in NWSB's name.*

The rigging and containment work subcontracted to NWSB was actually completed by ASI, Brighton or employees hired from the local union by ASI or Brighton.  The union employees

were placed on NWSB's payroll to make it appear that ASI had satisfied the Contract's DBE participation goal.  Indeed, NWSB did not even hire the union employees that ended up on its payroll, nor did NWSB supervise their work or pay them from its own funds.  Ashby Dep., 77:8-78:8 (To receive DBE credit toward a contract goal, a DBE must supervise and manage its employees, and pay them "through the DBE's own funds").

Mr. Casey testified, unequivocally, that NWSB "used the employees that the general contractor [ASI] hired from the union" to install the rigging and containment platforms and scaffolding.  Casey Dep., 54:1-16; *see also* Hedley Dep., 70:25-72:3 (Brighton hired all union employees for NWSB); Marley Dep., 127:15-129:18 (using Brighton's union relationship, Mr. Marley and Gary Smith, ASI's Project Manager, hired the union employees on NWSB's payroll); 162:17-163:9 (same).  Mr. Marley testified that NWSB did not have a single non-union employee on its payroll who performed, managed or supervised the work it was required to perform under the Subcontract.  Marley Dep., 133:2-4 ("every single" employee on NWSB's payroll "was from the local union"); 137:3-13 (same).

According to Mr. Casey, the local union employees on NWSB's payroll were supervised "mostly [by] the general contractor."  Casey Dep., 54:17-21.  Mr. Casey also claimed, disingenuously, that he "was in charge of the day-to-day operations" and served as NWSB's "lead foreman on the job."  *Id.* at 49:2-7; 234:10-11.  Those claims cannot be reconciled with Mr. Casey's admission that he was on the job site less than 25% of the time.  *Id.* at 65:9-66:20 ("I was there 150 days out of 700.").  The more reliable testimony confirms that ASI and former Brighton employees supervised all union hires on NWSB's payroll.

Paul Marley, a long-time Brighton employee and the General Superintendent on the Severn River Bridge Project, testified that ASI's "scaffolding crew" initially "stretch[ed] the cables"

across the bridge, and the union hires then completed the rigging and containment work under his supervision and the supervision of other former Brighton employees.  Marley Dep., 67:6-70:22; 71:6-21; 87:7-20, 133:5-13; 139:1-6.  The union hires installed the containment tarps, laid the Safespan platforms and completed related work under Mr. Marley's supervision.  *Id.* at 72:12-73:17; 76:25-77:7; 87:7-20.  The blasting and painting work under the Contract was also completed by union hires supervised by Mr. Marley and other former Brighton employees.  Marley Dep., 77:23-78:20; 79:17-80:19; 81:4-82:11.[4]  What's more, NWSB was not even certified to complete the rigging and containment work subcontracted to it by ASI.  Ex. 38 ("Crusse Aff."), ¶ 7.[5]

The fallacy of NWSB's purported work on this job is underscored by the fact that NWSB did not even run its own payroll.  That responsibility fell on ASI and Brighton.  Each week, Mr. Hedley would request that ASI wire funds to NWSB's payroll account to cover salaries due to the union employees on NWSB's payroll, plus NWSB's guaranteed 8% markup.  Ex. 39 ("R.Svoboda Dep."), 44:1-46:14.  ASI willingly obliged.  Ex. 40 (copies of Mr. Hedley's requests for ASI to fund NWSB's payroll, ASI's wire transfers to NWSB's payroll account, and corresponding bank statements for NWSB's payroll account).  In other words, ASI funded a payroll account maintained

---

[4] ASI attempts to skirt the fact that NWSB did not supervise the union employees on its payroll by claiming, falsely, that "NWSB employees were functioning in a field supervisory role."  Motion, p. 25.  The evidence confirms, however, that these so-called supervisors were all union hires who "never, ever got paid" as supervisors.  Marley Dep., 86:18-87:19 ("I just gave him – tapped him on the shoulder and gave him the magic wand, you're in charge."); 174:19-24 (everyone on NWSB's payroll was a journeyman or below).

[5] Mr. Svoboda volunteered at deposition that NWSB had completed similar rigging and containment work for ASI after the Severn River Bridge Project concluded, that NWSB "probably finished the last [rigging and containment job] within the last – within the last couple of months", and agreed to have someone at ASI compile a list of these recent jobs for Relators' counsel.  Svoboda Dep., 200:22-202:10.  ASI has since refused to provide the list, likely because Mr. Svoboda's testimony was false.  Indeed, his testimony cannot be reconciled with Mr. Casey's admission that no one at NWSB has spoken to ASI, or Mr. Svoboda in particular, in five or more years.  Casey Dep., 73:9-16.

-15-

in NWSB's name so that ASI could claim DBE credit for funds that passed-through that account. Hedley Dep., 307:3-11 (NWSB "received in a flow-through account, that we instructed them to set up, money to pay union painters that reported to Brighton."); 97:3-21 (NWSB "was nothing but a flow-through and a pass-through").[6]

### D.   ASI submits false information to MSHA regarding DBE compliance.

During the Contract, ASI was obligated to make regular and repeated submissions to MSHA regarding its compliance with all terms and conditions in the Contract, including the DBE participation goal.  These submissions took the form of weekly payrolls, quarterly reports, progress estimates, and certifications for final payment.  In each instance, ASI represented to MSHA that NWSB had completed work on the Severn River Bridge Project and therefore claimed, and received, credit toward the Contract's DBE participation goal.

Specifically, the Contract required that ASI and NWSB submit weekly payroll records to MSHA. Ex. 41, § V(2)(a)-(c).  Failure to do so would result in "such actions as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds." *Id.* at § V(2)(g). ASI submitted certified payrolls to MSHA on a weekly basis which falsely represented that NWSB had performed work on the Contract.  Exs. 42-43.

---

[6] During his July 13, 2017 deposition, Paul Marley testified that he participated in interviews with special agents from DOT's Office of Inspector General investigating DBE fraud involved in the Severn River Bridge Project.  Mr. Marley confirmed that he told the special agents that ASI used NWSB "as a DBE pass-through" on this job. Marley Dep., 100:18-102:8.  When pressed to explain that statement at his deposition, Mr. Marley grew uncomfortable and ultimately responded, "Do I need my own counsel?" *Id.* 102:9-102:25.  Mr. Marley was represented at deposition by James L. Volling, ASI's lead counsel in this case.  Mr. Volling quickly requested a break in the deposition to confer with Mr. Marley.  *Id.* at 103:1-2.  When Mr. Marley's testimony resumed 10 minutes later, Mr. Marley conveniently claimed that he could no longer remember why he labeled NWSB a DBE pass-through. *Id.* at 103:4-105:14.

The Contract also required that ASI submit quarterly reports to MSHA detailing DBE participation toward the 15% goal.  Ex. 1, § C.  Failure to submit DBE quarterly participation reports "may result in a finding of non-compliance" and lead to sanctions, including "withholding payment or a percentage thereof, pending correction."  *Id.* at §§ C(3) and D.  ASI initially refused to produce these reports, and MSHA sent ASI a succession of increasingly stern letters requesting the missing documentation.  Exs. 44-47.  The final letter "placed [ASI] in non-compliance" and noted suspension of payment as the penalty for ASI's continued failure to submit the DBE quarterly participation reports.  Ex. 47.  Facing non-payment, ASI created reports that falsely reflected NWSB's participation on the Severn River Bridge Project and submitted those reports to MSHA.  Ex. 48.

ASI was also required to, and did, submit monthly Contractor's Progress Estimates to MSHA.  The Progress Estimates reported progress on Contract Item 1001 ("Engineer's Boat") and Contract Item 4001 ("Cleaning and Painting Bridge"), and included a certification from ASI that "it has made payments from proceeds of prior payments, to… subcontractors all as required by section 17-106 of the State Finance and Procurement Article of the Annotated code of Maryland…"  Ex. 49.  In submitting the Progress Estimates to MSHA, ASI falsely represented that NWSB was responsible for and had performed work under the Contract.

Finally, after work under the Contract concluded in mid-2008, ASI submitted a Request for Approval of Subcontractor and a final Certification to MSHA.  Exs. 50-51.  In the first submission, ASI and NWSB certified that both entities were responsible for "all provisions of the contract", that ASI had met its DBE goal, and that NWSB had performed the necessary work to accomplish that goal.  Ex. 50.  In the second submission, ASI certified that it had completed all work required by the Contract and paid all subcontractors.  Ex. 51.  Both documents contained

false representations regarding NWSB's purported participation on the Severn River Bridge Project as a DBE subcontractor.

**VII.      ASI receives payment from MSHA.**

MSHA awarded the Contract to ASI based on the false information in its bid and Affirmation Action Plan regarding its ability and intent to satisfy the Contract's 15% DBE participation goal.  Dade Aff., ¶ 4.  Thereafter, ASI made repeated representations to MSHA regarding its work on the Severn River Bridge Project, including progress toward the DBE goal, as was required under the terms and conditions of the Contract.  *See supra* Arg. § VI(D).  These submissions were false because NWSB had not performed the work committed to it under the Subcontract.  *See supra* Arg. § VI(B)-(C).

Absent ASI's elaborate scheme to conceal NWSB's true role (*id.*), MSHA would not have honored ASI's requests for payment nor would it have submitted claims to DOT for the payment of federal funds.  Dade Aff., ¶¶ 4-5.  And, had DOT discovered during the performance of the Contract that ASI was falsely certifying compliance with the Contract's DBE participation goal, DOT would have denied the claims for payment that it received from MSHA.  Ashby Aff., ¶ 4.

MSHA and DOT had no knowledge of the DBE fraud until long after the Contract was completed.  Consequently, MSHA paid ASI more than $10 million, and FWHA paid MSHA $8,815,559.00. Ex. 52.

## STANDARD

"Summary judgment may be granted when the moving party shows that there is no genuine issue of material fact, and it is legally entitled to judgment."  *Snyder v. Chester County Mut. Ins. Co.*, 264 F. Supp. 2d 332, 336 (D. Md. 2003) (citing *Kitchen v. Upshaw*, 286 F.3d 179, 182 (4th Cir. 2002)).  "In other words, if there clearly exist factual issues 'that can properly be resolved

only by a finder of fact because they may reasonably be resolved in favor of either party,' then summary judgment is inappropriate." *Fairclough v. Bd. of County Com'rs of St. Mary's County, MD*, 244 F. Supp. 2d 581, 585 (D. Md. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).  In order to support the assertion that a fact cannot be genuinely disputed, the moving party "must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Fed. R. Civ. Pro. 56(c)(1)(A).  "Summary judgment … is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witness' demeanor." *Magill v. Gulf & Western Industries, Inc.*, 736 F.2d 976, 979 (4th Cir. 1984) (citations omitted).  "The court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Antonio v. Sec. Services of Am., LLC*, 701 F. Supp. 2d 749, 758 (D. Md. 2010) *on reconsideration in part*, CIV.A. AW-05-2982, 2010 WL 2858252 (D. Md. July 19, 2010) (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991)).

## SUMMARY OF ARGUMENT

Defendants' Motion should be denied because there are genuine disputes of material fact precluding summary judgment.  Specifically, the evidence demonstrates that ASI made overt false statements to MSHA to obtain the Contract and continued to misrepresent compliance with the Contract's DBE participation goal as work progressed.  Further, even if ASI's representations and certifications were not false on their face (which they were), ASI's statements violate the FCA under the implied certification theory.  These falsehoods, overt or implied, were material to the Government's decision to pay ASI, and ASI knew it.  Because ASI's fraud deprived the

Government of the basic objective of this DOT-funded Contract—assisting small and minority businesses—the Government did not get the intangible benefit that it paid for.  The law provides for disgorgement of all payments made to ASI on false pretenses.

**ARGUMENT**

**I.      ASI made numerous overt false claims for payment.**

ASI's assertion that "Relators do not seriously contend that the DBE-related documents submitted by ASI were actually false on their face" is belied by the facts.  Motion, p. 16.  As shown above, ASI made frequent, overtly false representations prior to and during the course of the Contract in order to convince MSHA, FWHA and DOT that ASI was complying with the Contract, including necessarily the DBE provisions of the Contract, and these false representations caused MSHA, FHWA and DOT to award the Contract to ASI and make payments thereunder.  *See supra* Arg. §§ VI(D) and VII.

> *A.      The Contract itself was obtained through overt fraudulent inducement.*

ASI baldly claims that there is no evidence that would allow a reasonable jury to find fraud in the submission of ASI's bid documents.  Motion, p. 24.  This ignores the specific and overt representation by ASI that it would use NWSB as a DBE in performing the Contract.

The  fraud-in-the-inducement theory extends FCA liability to occasions in which "the contract or extension of a government benefit was obtained originally through false statements or fraudulent conduct." *Harrison v. Westinghouse Savannah River Co. ("Harrison I")*, 176 F.3d 776, 787 (4th Cir. 1999); *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943) (finding FCA liability where the defendants obtained government contracts through "collusive bidding") superseded by statute on other grounds as recognized by *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 402, 131 S.Ct. 1885, 1893–94, 179 L.Ed.2d 825 (2011).

-20-

The Supreme Court has held that claims submitted pursuant to a fraudulently obtained contract are FCA violations even if the claims themselves do not contain false statements. *Marcus*, 317 U.S. at 543–44. In *Marcus*, the Supreme Court explained that the "initial fraud did not spend itself with the execution of the contract… The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *Id.* at 543-44.

In order to prove a fraudulent inducement claim, a plaintiff must demonstrate that "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *United States. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (citations omitted); *United States ex rel. Elms v. Accenture LLP,* 341 Fed. Appx. 869, 872 (4th Cir. 2009).

The application of this theory to the instant case is clear. ASI fraudulently secured the Contract by certifying in its bid that it would use NWSB to comply with the Contract's DBE participation goal when it had no intention of permitting NWSB to perform the work. *See* Hedley Aff., ¶¶ 6-10 (ASI convinced NWSB to lend its name and DBE certification to ASI's bid for the Contract and subsequent submissions to MSHA to make it appear that ASI intended to and did comply with the Contract's 15% DBE participation goal); *see also supra* Arg. § III (describing the ASI-NWSB scheme). But for this initial fraud, ASI would not have received the Contract, nor any of the payments made thereunder. Dade Aff., ¶¶ 4-5.

In fact, ASI did not receive the Contract until after it submitted false DBE-related documents, including its bid and Affirmative Action Plan, to MSHA. *See* Exs. 7, 13-14; *see also supra* Arg. § V. MSHA's Director of the Office of Equal Opportunity, Wanda Dade, confirmed

in her Affidavit that MSHA would not have awarded the Contract to ASI had MSHA known that ASI did not intend to use NWSB to the extent necessary to achieve the Contract's DBE goal. Dade Aff., ¶ 4. Accordingly, even if ASI's subsequent statements to MSHA were not technically false (which they were), ASI's initial fraudulent submissions "and every step thereafter" enabled ASI to press toward its "ultimate goal—payment of government money to [ASI]." *Marcus*, 317 U.S. at 543-44.

ASI takes issue with the timing of the alleged fraud, arguing that the fraudulent scheme was not developed until September 2006, while the Contract was bid and formed in June 2006. This grossly misstates the evidence. *See supra* Arg. § III. Mr. Hedley testified that he first learned of the ASI-NWSB arrangement during a telephone conversation with Mr. Svoboda in August or September 2006. Hedley Dep., 81:3-83:8. In that conversation, Mr. Svoboda explained that ASI had been unable to find a legitimate DBE to join its bid for the Contract; that ASI had convinced NWSB to lend its name and DBE certification to ASI—in bidding for the Contract and thereafter— to make it appear that ASI intended to and did comply with the Contract's 15% DBE participation goal; and that ASI had guaranteed NWSB an 8% markup on all materials purchased through and payroll processed under NWSB's name. Hedley Aff., ¶¶ 6-10; *see also* Hedley Dep., 81:3-7; 97:3-21. The only fair interpretation of that evidence is that ASI intended from the very beginning to use NWSB as a pass-through, performing no commercially useful function on the Project. *See supra* Arg. §§ III, VI(B)-(C); Hedley Dep., 89:21-90:11 (explaining that Brighton and ASI "were to say that [NWSB was] doing rigging and containment, and we [Brighton and ASI] were going

to buy some equipment and engineering stuff through them."); Crusse Aff., ¶ 7 (NWSB was not

even certified to do the rigging and containment work).[7]

>    **B.**    *ASI continued to make false and fraudulent claims throughout the course of the Contract.*

ASI illogically concludes that, because the false claims identified by Relators do not on

their face contain the statement, "NWSB performed a commercially useful function on the Severn

River Bridge Project," they cannot be overtly false.    This severely mischaracterizes the

requirement for an "overt false representation."    The FCA merely requires an "objective

falsehood" as distinguished from "allegations of poor and inefficient management of contractual

duties" or "imprecise statements or differences in interpretation growing out of a disputed legal

question".    *Wilson*, 525 F.3d at 377 (internal citations omitted).    Indeed, the phrase "false or

fraudulent claim" in the FCA is to be construed broadly.    *Id.* at 378.    The FCA "reaches beyond

'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to

pay out sums of money." *Harrison I*, 176 F.3d at 788 (citing *United States v. Neifert–White Co.*,

390 U.S. 228, 233 (1968)).

Here, the false claims identified by Relators are not a matter of opinion or interpretation;

the evidence establishes that from beginning to end, NWSB was merely a pass-through used to

create a paper trail of purported compliance with the Contract's DBE requirements.    *See supra*

Arg. §§ III (describing the fraud in inception) and VI(B)-(C) (detailing ASI's elaborate efforts to

hide NWSB's status as a DBE pass-through during the performance of the Contract); Crusse Aff.,

¶ 7 (NWSB was not even certified to do rigging and containment work).    NWSB simply acted as

---

[7] Even if the conflicting testimony concerning NWSB supplying a safety boat for the Severn River Bridge Project is to be believed, at best, NWSB completed less than 3% of the work it was subcontracted to perform.    Ex. 17, p. 23 (valuing the boat as $41,600.00 of the $1,569,200.00 worth of work subcontracted to NWSB); G.Svoboda Dep., 28:6-7 ("we weren't going to get anywhere near 15 percent [DBE participation] on the boats and safety boats, etcetera.").

a "flow-through and a pass-through," or an "extra participant… through which funds [were] passed in order to obtain the appearance of DBE participation."   Hedley Dep., 97:3-21 and 81:3-7; 49 C.F.R. § 26.55(c).  NWSB did not perform a commercially useful function, and claiming DBE credit for work performed in NWSB's name was wholly improper.  49 C.F.R. § 26.55(a), (c); *see also* Ashby Dep., 68:23-72:10, 75:20-77:7 and 81:6-18 (explaining the commercially useful function concept and the proper counting of DBE credit).

ASI's assertion that there is no connection between the falsity of ASI's claims and submissions for payment to the Government is likewise baseless.  Motion, p. 19.  It is not relevant that the specific documents submitted to MSHA by ASI were not themselves passed on to the Government; MSHA would not have requested the release of federal funds had it known that the repeated certifications of compliance with the Contract's DBE requirements were false.  Dade Aff., ¶ 5.  In other words, ASI's certifications to MSHA were required by the Contract and without them, MSHA never would have requested or paid to ASI federal funds.  *Id.*[8]

## II.    The implied certification theory supports Relators' FCA claims.

The Supreme Court recently clarified that "false or fraudulent claims" under the FCA include more than just claims containing express falsehoods.  *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016).  By punishing defendants

---

[8] ASI suggests that MSHA tacitly approved of the fraud because it did not insist until late in the Contract that ASI submit its quarterly DBE participation reports.  Motion, pp. 10-11, 21-22.  This claim is absurd.   MSHA had already received dozens of documents from ASI falsifying compliance with the Contract's DBE participation goal.  Exs. 7, 13-14, 42-43, 49.  Regardless, MSHA's decision to threaten withholding payment as a result of ASI's failure to submit quarterly DBE participation reports proves Relators' point: evidence of compliance with the Contract's DBE participation goal was critical to ASI receiving payment under the Contract.  Exs. 44-47.  If, as ASI suggests, compliance with the Contract's DBE terms were immaterial to MSHA, it would not have made such a serious threat in the response to ASI's failure to produce documents reporting (falsely) that it satisfied the DBE participation goal.  The fact remains, had MSHA known of the fraud, it would not have awarded the Contract to ASI or approved payment to ASI.

who submit "false or fraudulent claims," the FCA encompasses claims that make fraudulent misrepresentations, through certain misleading omissions. *Id.* at 1999. "When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.*; *see also United States ex rel. Garzione v. PAE Gov't Services, Inc.,* 670 Fed. Appx. 126, 127 (4th Cir. 2016) (recognizing the implied certification theory of liability); *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.,* 838 F.3d 750, 761 (6th Cir. 2016) (same); *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) (same).

*Escobar* was recently analyzed by the Fourth Circuit in *United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017). In *Triple Canopy*, the defendant had a contract with the Government to provide security services, including guards who could meet certain marksmanship standards. *Id.* at 175. Defendant submitted monthly invoices for its guards, "but was not required to certify that its guard services complied with the contract's responsibilities." *Id.* at 175-176.

Just as ASI contends that the NWSB payroll records are not false because they simply list the names of the NWSB "employees" and the amounts paid, the Defendant in *Triple Canopy* argued "that it merely submitted invoices listing the number of guards and hours worked and these invoices contained no falsities on their face." *Id.* at 178. The *Triple Canopy* Court held that *Escobar* "is not as crabbed as Triple Canopy posits. In announcing the rule, the [*Escobar*] Court made clear that it was targeting omissions that 'fall squarely within the rule that half-truths— representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.'" *Id.* (citing *Escobar*, 136 S. Ct. at 2000). The *Triple Canopy* Court ruled that a false claim was properly alleged against the defendant

because anyone reviewing defendant's invoices "would probably—but wrongly—conclude that [Triple Canopy] had complied with core [contract] requirements." *Id.* (citing *Escobar*, 136 S. Ct. at 2000).

The "half-truth" present in *Triple Canopy* and *Escobar* is also present here: although ASI knew it was not complying with its responsibilities under the Contract with regard to NWSB, it nonetheless continually requested payment from the Government. Anyone reviewing ASI's bid documents, progress reports, payroll documentation and quarterly DBE reports would necessarily conclude that they represent compliance with the Contract's requirement of 15% DBE participation.

## III. ASI's continued falsehoods were material to the United States' payment of claims.

ASI argues that Relators' claims show only "technical non-compliance by ASI" and such non-compliance "was not material" to payment. Motion, p. 27. ASI both mischaracterizes its conduct as "technical non-compliance" and overstates the "demanding" nature of the materiality standard discussed in *Escobar*. In fact, *Escobar* did not change the law regarding materiality in the Fourth Circuit: "If anything, we took a narrower view of materiality than the [Supreme] Court." *Triple Canopy, Inc.*, 857 F.3d at 178, n. 4. Saliently, the *Triple Canopy* Court stated:

> In analyzing materiality, we noted that a material falsehood was one that was capable of influencing the Government's decision to pay. We explained that the standard was a high one intended to keep FCA liability from attaching to 'noncompliance with any of potentially hundreds of legal requirements' in a contract. Applying the standard, we found Triple Canopy's omissions material for two reasons: common sense and Triple Canopy's own actions in covering up the noncompliance. That conclusion perfectly aligns with *Universal Health*.

*Id.* at 178 (internal citations and quotations omitted). The test for materiality within the Fourth Circuit continues to be, at its base, whether the misrepresentation was "capable of influencing the Government's decision to pay." *Id.* ASI's submissions to MSHA were clearly so capable.

-26-

First, as described above, ASI could not have obtained the Contract itself, and all payments thereunder, without making false, material claims in the initial bid and in the Affirmative Action Plan about its ability and intention to meet the DBE goal on the Severn River Bridge Project.  Dade Aff., ¶ 4.  DOT's DBE regulations provide that failure by a contractor to carry out the requirements of the DBE program is a material breach of the DOT-funded contract.  49 C.F.R. § 26.13(b).  MSHA was legally required by 49 C.F.R. § 26.37 to ensure ASI's compliance with the DBE program.  This included monitoring ASI's compliance and using appropriate remedies in the event of non-compliance, including withholding payment from ASI, to enforce the DBE program.  *Id.* at § 26.13(b); *see also* Ex. 1, § D.

The documents ASI provided to MSHA during and after the purported fulfillment of the Contract, including the Affirmative Action Plan, DBE quarterly participation reports, payroll records, progress estimates, and subsequent certifications of compliance, were all false and were all required by MSHA in order to fulfill its lawful obligations to ensure ASI's compliance with the DBE program.  In the absence of ASI's fraud, MSHA would not have submitted claims to the Government for DBE work that was not performed by a DBE, Dade Aff., ¶ 5, and the Government would not have released federal funds to MSHA.  Ashby Aff., ¶ 5.

While ASI urges some heightened proof of materiality, under *Triple Canopy*, a court is allowed to simply use its "common sense" in determining whether particular omissions are material.  *Triple Canopy*, 857 F.3d at 178.  ASI's "own actions in covering up the noncompliance" speaks volumes, and demonstrates that ASI "realized the materiality" of the DBE requirement.  *Id.* at 176-178.  ASI went to great lengths to order materials in NWSB's name, hire, manage and supervise the union employees on NWSB's payroll, and otherwise perform all work and services subcontracted to NWSB.  *See also supra* Arg. § VI(B)-(C).  For example, although NWSB "was

responsible for the engineering" under its Subcontract with ASI, Mr. Svoboda admitted that NWSB "did not do any engineering."  G.Svoboda Dep., 126:17-127:22.   Moreover, on a number of occasions, Mr. Svoboda actually requested that suppliers create new invoices or amend their work product to cover-up ASI's role in negotiating the deals and making payment through NWSB. *See* Exs. 28; 33 at p. 1; 35 at pp. 3-4; 36. Considering that neither MSHA nor DOT would have approved payment to ASI had they known of the DBE fraud, common sense dictates that ASI's omissions regarding falsified DBE compliance were material to payment.  Dade Aff., ¶ 5; Ashby Aff., ¶ 5.

ASI also claims that the mere fact it received payment on the Contract without the Government taking any action against it amounts to a demonstration that the DBE requirement was not material.  The actual facts are that ASI was paid *because of ASI's fraud and false representations regarding NWSB*, in that such efforts concealed the fraud until long after the job was completed.  Likewise, ASI's confusing assertion that MSHA necessarily observed and consented to NWSB's nonperformance of a commercially useful function on the Severn River Bridge Project is untenable; MSHA saw only ASI's manufactured indicia of performance and relied upon ASI's repeated representations of compliance.

## IV.  The evidence demonstrates that ASI "knowingly" submitted false statements in seeking payment.

ASI argues that there is no evidence upon which a reasonable jury could conclude that ASI knew that the representations regarding DBE participation were material to the Government's decision to pay.  Motion, p. 31.  Under the FCA, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."  *Harrison I*, 176

F.3d at 785; *see also United States ex rel. Rostholder v. Omnicare, Inc.*, CIV. CCB-07-1283, 2012

WL 3399789, at *12 (D. Md. Aug. 14, 2012), *aff'd*, 745 F.3d 694 (4th Cir. 2014). (citing 31 U.S.C.

§ 3729(b)).In discussing the scienter elements of the FCA, the *Escobar* Court said:

> A defendant can have 'actual knowledge' that a condition is material without the
> Government expressly calling it a condition of payment. If the Government failed
> to specify that guns it orders must actually shoot, but the defendant knows that the
> Government routinely rescinds contracts if the guns do not shoot, the defendant has
> 'actual knowledge.'   Likewise, because a reasonable person would realize the
> imperative of a functioning firearm, a defendant's failure to appreciate the
> materiality of that condition would amount to 'deliberate ignorance' or 'reckless
> disregard' of the 'truth or falsity of the information' even if the Government did
> not spell this out.

*Escobar*, 136 S.Ct. at 2001-02; *see also Triple Canopy, Inc.*, 857 F.3d at 179.  Just as a reasonable

person would recognize "the imperative of a functioning firearm," a reasonable person should

recognize the imperative of a subcontractor, whose participation on the job is a specific

requirement under the contract, to actually perform its contractual duties.

    Regardless of ASI's claims on this point, the evidence is clear that Mr. Svoboda knew that

a DBE must: "(1) be capable of performing th[e] work, (2) perform the work that they've

contracted[-for] and are obligated to perform, (3) hire and pay its laborers, and (4) acquire and pay

for materials for use in the DBE's portion of the contract."  Motion, p. 32 (citing Svoboda Dep,

34:7-35:7).   The evidence demonstrates that NWSB, through ASI's specific and deliberate

assistance, did none of these things.

    One of the obvious indicators that ASI's misrepresentations were done knowingly is the

machinations ASI went through in order to conceal NWSB's nonperformance.  *See also supra*

Arg. § VI(B)-(C) (describing ASI's many efforts to cover-up that it performed the work

subcontracted to NWSB, including purchasing materials in NWSB's name and hiring, managing

and supervising the union employees that ended up on NWSB's payroll).  Simply put, if ASI did

not know that NWSB was required to do these things, and did not further know that the Government cared whether or not NWSB did these things, why did ASI go to such lengths to make it appear that NWSB did them?

ASI's argument that the Government gave "tacit approval to ASI's operations" is difficult to countenance.  Motion, p. 31.  ASI was not paid by MSHA despite NWSB's nonperformance of a commercially useful function, but because ASI deliberately hid NWSB's nonperformance.  Dade Aff., ¶ 5; Ashby Aff., ¶ 5.

ASI further argues that Relators' contention that NWSB did not perform a commercially useful function amounts to only a difference of opinion over a highly technical and vague regulation.  Motion, p. 31.  It may be that some disputes over a DBE's performance of a commercially useful function descend into a highly nuanced debate, but this is not the case here. Mr. Svoboda clearly understood what NWSB, as ASI's DBE subcontractor, was supposed to do. Svoboda Dep, 34:7-35:7. ASI's violation of the DBE requirement is so flagrant and total that there can be no genuine dispute that NWSB served almost entirely as a mere pass-through lending its name to ASI.  The evidence demonstrates straight-forward fraud with a straight-forward purpose: to create the appearance of compliance with the Contract's DBE requirement and thereby obtain payment under the Contract.

**V.     Disgorgement of all payments received by ASI is the appropriate measure of damages.**

This is not a situation where DOT and FHWA simply paid for the painting of a bridge. The Contract included strict requirements aimed at advancing the critical objective of DOT's DBE program: helping socially and economically disadvantaged businesses grow. Ex. 1, p. 1. ASI's reliance on *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003) ("*Harrison II*") is misplaced, because this case involves a grant to a recipient with no

-30-

direct tangible benefit to the federal Government.  The Government has been damaged here because it did not get the intangible benefit it paid for.

The Contract expressly incorporated "the disadvantaged business enterprise requirements of 49 CFR Part 26", meaning that, among other things, a DBE was to perform a "commercially useful function" on the Severn River Bridge Project.  49 C.F.R. § 26.55(c).  By circumventing the DBE requirements in fraudulently inducing the Contract and repeatedly misrepresenting compliance with the Contract's DBE participation goal, ASI deprived the Government of one of its primary objectives in funding the Contract.

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009), is instructive.  In *Longhi*, the contracts entered into between the Government and the defendants did not produce a tangible benefit to the Government, and the end product did not belong to the Government. *Id.* at 473. Instead, the purpose of the government program was to enable small businesses to reach a point where they could—by themselves—commercially market their products. *Id.* The Government's benefit of the bargain was to fund eligible deserving small businesses. *Id.* The Fifth Circuit held that the *Longhi* defendants had misrepresented their experience and capability in obtaining government funds under the program, and, thus, their fraud caused the Government to lose the intangible benefit of providing an "eligible deserving" business with funding. *Id.* Disgorgement of the entire amount received by the *Longhi* defendants was therefore proper.  *Id.* Similarly, "[w]hen the conditions [for a government subsidy] are not satisfied, nothing is due . . . [so] the entire amount that [the defendant] received [from the subsidy] must be paid back." *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008).  Therefore, in an FCA case, the defendant may not "keep the money obtained from the Treasury by false pretense, or avoid the penalty for deceit." *Id.*

Here, the appropriate outcome is disgorgement of all funds paid to ASI as a result of it thwarting the intended government benefit of providing opportunities to minority-owned businesses. *See, e.g., United States v. Anghaie*, No. 15-10454, 2015 WL 7720313, at \*5 (11th Cir. Nov. 30, 2015) (because defendants "lied about why they deserved" federal funding earmarked to assist "small-business concerns", their "fraud deprived the government of the benefit of funding deserving and eligible research" and supported damages "based on the full amount the government paid the Anghaies"). ASI's conduct deprived a legitimate DBE of the opportunity to work on a DOT-funded contract and obstructed the foundational objective of the DOT DBE program to help minority businesses develop into commercially viable enterprises.

District Courts considering DBE fraud claims under the FCA have concluded that such fraud concerns intangible government benefits, and thus damages were available against the contract as a whole. In two opinions from 2009, the Western District of Pennsylvania recognized that disgorgement is appropriate in fraudulent DBE cases. *United States ex rel. Laymon v. Bombardier Transp. (Holdings) USA*, 2009 WL 793627 (W.D. Pa. March 23, 2009); *United States ex rel. Laymon v. Bombardier Transp. (Holdings) USA*, 656 F. Supp. 2d 540 (W.D. Pa. 2009). In *Laymon*, a contractor hired to clean and maintain trains in the San Francisco Bay-area BART system was accused of fraudulently submitting DBE reports which BART relied upon in submitting its DBE figures to DOT. *Laymon*, 656 F. Supp. 2d at 542-43. In moving for summary judgment, the defendant argued that the government suffered no damages because it "got what it paid for," and regardless, defendant had not received reimbursement for work described in the fraudulent DBE reports. *Laymon*, 2009 WL 793627, \*13. The Court disagreed, holding that "[i]f Bombardier's [DBE] figures were incorporated into DOT's and BART's cumulative DBE program total, then the government was harmed in that it reimbursed BART for payments to Bombardier

-32-

even though its DBE program was being undermined by false certification of compliance with DBE regulations." *Id.*; *see also Laymon*, 656 F. Supp. 2d at 546 (in permitting testimony on the amounts paid to defendant, the Court held that, "where, as here, there is only an intangible benefit to the government which benefit is impossible to calculate, it is appropriate to value the damages to the government in the amount actually paid to the Defendant").

Likewise, in *United States ex rel. King v. F.E. Moran*, a contractor on a post office in Chicago falsified documents to show compliance with minority business enterprise ("MBE") subcontracting requirements.  2002 WL 2003219 (N.D. Ill. Aug. 29, 2002).  In its summary judgment briefs, Moran argued that the *qui tam* relator had not asserted damages against the government.  *Id.* at *11.  The court rejected this argument, finding that "[t]he government clearly expected its contractors to meet the MBE goals…[i]f Moran set up a scheme to get around the government's MBE requirements, the government was harmed in that it paid Moran even though its MBE program was being undermined."  *Id.*  Despite receiving the post office as contracted for, the court found that failure to meet MBE requirements constituted damages and denied summary judgment.  *Id.* at *14.

ASI's insistence on a rigid application of damage formulas from cases with significantly different facts from those presented here is inconsistent with the FCA itself, which, as many courts have noted, does not itself explicitly define damages.  *See, e.g., United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988).  Notably, the legislative history of the FCA, approvingly cited in *Killough*, provides:

> No single rule can be, or should be, stated for the determination of damages under the Act . . . [f]raudulent interference with the government's activities *damages the government in numerous ways that vary from case to case.* Accordingly, the committee believes that the courts should remain free to fashion measures of damages on a case by case basis. The Committee intends that the courts should be guided only by the principles that the United States' damages should be liberally

measured to effectuate the remedial purposes of the Act, and that the United States should be afforded a full and complete recovery of all its damages.

*Id.* (citing S. Rep. No. 615, 96th Cong., 2d Sess. at 4 (emphasis added)).

ASI's "no harm, no foul" argument on damages is nonsensical.  The evidence demonstrates that ASI intentionally and continuously undermined a primary, intangible goal of the Contract, and that had MSHA and DOT discovered ASI's fraud, it never would have received payment.  Under these circumstances, disgorgement of all amounts paid to ASI is the proper measure of damages.

**VI.     Relators' conspiracy claim survives summary judgment.**

ASI argues that it is entitled to summary judgment on Relators' conspiracy claim only because the underlying claims fail.  Motion, p. 35.  As discussed above, all of Relators' claims are legally and factually supportable.  Thus, ASI is not entitled to summary judgment on Relators' conspiracy claim.

<u>**CONCLUSION**</u>

For all the foregoing reasons, ASI's Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Gerard P. Martin*
Gerard P. Martin, Bar No. 00691
Harris W. Eisenstein, Bar No. 29694
Rosenberg Martin Greenberg, LLP
25 S. Charles Street, 21st Floor
Baltimore, Maryland  21201
(410) 727-6600 (phone)
(410) 727-1115 (facsimile)
gmartin@rosenbergmartin.com
heisenstein@rosenbergmartin.com

Elkin L. Kistner (*pro hac vice*),
Bar No. 802448
101 South Hanley Road, Suite 1280
St. Louis, Missouri  63105
(314) 571-6823 (phone)
(314) 727-9071 (facsimile)
elkinkis@kick-kistner.com

Joseph V. Neill (*pro hac vice*),
Bar No. 802445
5201 Hampton Avenue
St. Louis, Missouri  63109
(314) 353-1001 (phone)
(314) 353-0181 (facsimile)
Neill5300@aol.com

*Attorneys for Relators,*
*Joseph M. Hedley and Fred A. Rauch, III*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of September, 2017, a copy of the foregoing

Opposition to Defendant's Motion for Summary Judgment was served electronically via the

Court's CM/ECF system on all counsel and parties receiving electronic notice of pleadings filed

in this case.


/s/ Gerard P. Martin
Gerard P. Martin