IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,     *
  ex *rel.* JOSEPH M. HEDLEY and
  FRED A. RAUCH, III,     *

    Plaintiffs,     *

                         Civil Action No. RDB-14-2935

    v.     *

ABHE & SVOBODA, INC.,     *

    Defendant.     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

On June 15, 2006, the Maryland State Highway Administration ("MSHA") notified Defendant ABHE & Svoboda, Inc. ("ASI") that it submitted the lowest bid for a contract to clean and repaint the Severn River Bridge[1] (the "Contract"). Over almost the next two and a half years, MSHA paid ASI under the Contract until January 13, 2009 when MSHA approved the final payment. Over two years later, on April 25, 2011, Fred A. Rauch, III and Joseph M. Hedley ("Relators") filed a Complaint in the United States District Court for the Southern District of Illinois against ASI under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, alleging that ASI falsely represented to MSHA that it used a Disadvantaged Business Enterprise ("DBE") subcontractor under the Contract. (ECF No. 1.) The United States initially elected to intervene in this action (ECF No. 18), but subsequently withdrew its intervention in 2013 (ECF No. 50).

---

[1] The Severn River Bridge is officially named the "Pearl Harbor Memorial Bridge." (ECF No. 149-9 at ¶ 3.)

Since filing their initial Complaint in the Illinois Court, the Relators Rauch and Hedley have filed First, Second, and Third Amended Complaints. Through this Court's rulings on ASI's Motions to Dismiss, the Relators were permitted discovery with respect to three claims under the False Claims Act. Ultimately, at the conclusion of all discovery, on August 8, 2017, ASI filed the instant Motion for Summary Judgment on all three claims. (ECF No. 144.) The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the following reasons, ASI's Motion for Summary Judgment (ECF No. 144) is GRANTED and Judgment is ENTERED in favor of the Defendant ABHE & Svoboda, Inc.

## BACKGROUND

### I.     Procedural background

In ruling on a motion for summary judgment, the court reviews the facts and all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). This action arises from a contract between Defendant ASI and the Maryland State Highway Administration ("MSHA") for the cleaning and repainting of the Severn River Bridge (the "Contract"). On April 25, 2011, Fred A. Rauch, III and Joseph M. Hedley ("Relators") filed a Complaint against ASI under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, alleging that ASI falsely represented to MSHA that it used a Disadvantaged Business Enterprise ("DBE") subcontractor under the Contract. (ECF No. 1.) As relators, Rauch and Hedley initially filed this action in the United States District Court for the Southern District of Illinois. After the United States elected to intervene (ECF No. 18), it

filed a First Amended Complaint alleging violations of the FCA and various state law claims (ECF No. 19). ASI subsequently filed a Motion to Dismiss the First Amended Complaint, or alternatively, transfer this case to this Court pursuant to 28 U.S.C. § 1404(a). (ECF No. 33.) While that Motion to Dismiss was pending, the United States moved to withdraw its intervention, which was granted by the United States District Court for the Southern District of Illinois. (ECF Nos. 50, 52.)

The Relators continued to pursue this action, now standing in for the Government without Government participation. After the case was transferred to this Court,[2] ASI filed a renewed Motion to Dismiss. (ECF No. 76.) On July 31, 2015, this Court granted ASI's Motion to Dismiss, dismissing Relators' FCA claims without prejudice (Counts I-III) and dismissing Relators' state law claims with prejudice (Counts IV, V, VII). (ECF Nos. 84, 85.) This Court subsequently permitted the Relators to file a Second Amended Complaint (ECF No. 93), and ASI filed a Motion to Dismiss Relators' Second Amended Complaint (ECF No. 97). On July 29, 2016, this Court denied ASI's Motion to Dismiss Relators' Second Amended Complaint, explaining in part that ASI's Motion focused heavily on the Relators' failure to *prove* their claims, not their failure to sufficiently allege their claims under the heightened pleading standard of Federal Rule of Civil Procedure 9(b). (ECF No. 102.) On December 1, 2016, Relators filed a Third Amended Complaint (ECF No. 123), and two weeks later ASI filed an Answer (ECF No. 124). Discovery ensued, and on August 8, 2017, ASI filed the instant Motion for Summary Judgment. (ECF No. 144.)

---

[2] On September 16, 2014, the United States District Court for the Southern District of Illinois held a hearing on ASI's Motion to Dismiss, and dismissed with prejudice Relators' unjust enrichment claim (Count VI), and transferred the action to this Court pursuant to 28 U.S.C. § 1404(a). (ECF No. 63.)

## II.        Factual Background

While considering the facts and all inferences in the light most favorable to the Relators Rauch and Hedley, it is important to note how these two Relators became involved with ASI and the Contract to clean and repaint the Severn River Bridge. Prior to MSHA's solicitation for bids for the Contract, ASI became a creditor of Brighton Painting Company ("Brighton"), its owners, and related entities. (Hedley Aff., ECF No. 149-9 at ¶ 3.) The Relators in this case, Joseph Hedley and Fred Rauch, are Brighton's two owners. (*Id.* at ¶ 2.) The parties agreed that Brighton could repay its debt by managing various projects for ASI and applying profits derived from those projects to the debt. (*Id.* at ¶ 4.) This agreement ultimately led to Brighton and the Relators' participation under the Contract. (*Id.* at ¶ 5.)

In April of 2006, MSHA began advertising for bids for the Contract. (ECF No. 145-1 at 32.) The Contract was substantially funded by the Federal Highway Administration ("FHA") within the United States Department of Transportation ("DOT"). The Contract included an affirmative action requirement to utilize Disadvantaged Business Enterprises ("DBEs"). (*Id.* at 52.) Specifically, the Contract included a 15 % DBE participation goal and stated:

> It is the policy of the Maryland Department of Transportation that disadvantaged business enterprises as defined in 49 CFR Part 26 and the Transportation Equality Act of 1998 (TEA-21) shall have an equal opportunity to participate in the performance of the contracts financed in whole or in part with Federal funds under these agreements. Consequently, the disadvantaged business enterprise requirements of 49 CFR Part 26 and TEA-2 1 apply to this agreement.
> . . .
> The bidder shall seek commitments from disadvantaged business enterprises by subcontracting and/or procurement of materials and/or services, the combined value of which equals or exceeds the appropriate percent (goal) of the total value of the prime contract. A bidder may count toward its DBE

goals expenditures for materials and supplies obtained from DBE regular dealers and/or manufacturers provided that the DBEs assume the actual and contractual responsibility for the provision of the materials and supplies. The bidder may count its entire expenditure to a DBE manufacturer (*i.e.*, a supplier that produces goods from raw materials or substantially alters them before resale). The bidder may count sixty (60) percent of its expenditures to a DBE regular dealer, that is not a manufacturer, provided that the DBE supplier performs a commercially useful function in the supply process.

(*Id.* at 52, 54.)[3] The Contract further provided that once a party was notified by MSHA that it was the apparent low bidder, the bidder was required to submit an Affirmative Action Plan ("AAP") for the utilization of DBEs during the Contract. (*Id.* at 54-55.) The Contract specified that a contract would not be awarded without the approval of the bidder's AAP. (*Id.* at 55.) The AAP needed to include, at a minimum, a Schedule for Participation of the certified DBE and a DBE Project Disclosure and Participation Certificate for each DBE listed in the Schedule for Participation. (*Id.*) However, DBE participation was not an absolute requirement for the Contract. Indeed, the Contract stated that "[w]here the proposed DBE participation does not meet the DBE contract goals, information sufficient to demonstrate that the bidder has made good faith efforts to meet these goals shall be required."[4] (*Id.*) Further, if the bidder was unable to secure from the DBE(s) commitment(s) that at least equaled the DBE participation goal, the bidder was required to submit a waiver for the unmet portion of the goal, for the Administrator to consider. (*Id.*)

Once awarded the Contract, the Contractor was required to keep and submit records necessary to determine DBE compliance. (*Id.* at 56-67.) These records included quarterly reports and monthly reports listing unpaid invoices from all certified DBE subcontractors.

_____

[3] This is the only reference to "commercially useful function" in the entire Contract.
[4] This is consistent with the implementing federal regulation that a recipient, such as MSHA, must not deny an award of a contract to a bidder that shows good faith efforts to meet a DBE goal. 49 C.F.R. § 26.52(a).

(*Id.* at 57-58.) The Contract stated that failure to submit the quarterly reports "may result in a finding of noncompliance." (*Id.* at 57.) If a party was found in noncompliance, the administrative procedures for enforcement then gave MSHA discretion to choose a sanction, including (1) suspension of work on a project, pending correction; (2) withholding payment or a percentage thereof, pending correction; (3) referral to different agencies for further action; or (4) any other sanction as appropriate. (*Id.* at 58.)

On June 15, 2006, ASI submitted its bid to MSHA. (ECF No. 145-2.) Pursuant to ASI's arrangement with Brighton, the parties informally agreed that Brighton would help with the execution of the Contract, "essentially act[ing] as an agent of ASI by managing the job and ensuring it was completed timely and correctly." (Defs. Mem., ECF No. 144-1 at 6.) In its bid, ASI asserted that in order to reach the 15% DBE goal, it would use Northeast Work & Safety Boats, LLC ("NWSB") for "work platforms, work boats, and engineer's boat." (ECF No. 145-2 at 20.) ASI would pay NWSB $1,569,200.00, representing 15.16% of the total Contract value. (*Id.* at 20-21.) Specifically, ASI represented on its proposed Schedule of Participation that "I certify that I/we intend to achieve the goal stated in this contract and will use the MDOT certified MDE/DBE subcontractors/suppliers listed in Part II to accomplish the goal." (*Id.* at 20.) ASI listed NWSB in Part II and stated that the items of work would be "work platforms, work boats, and engineer's boat." (*Id.*) Gail Svoboda, President of ASI, testified however that ASI could have still received the bid even if it did not meet the DBE requirement, if pursuant to the Contract it made a good faith effort to meet the goal. (Svoboda Dep., ECF No. 146-1 at 10, 64.) That day, on June 15, 2006, ASI learned that it submitted the lowest bid. (ECF No. 149-13.)

On June 20, 2006, ASI submitted its Affirmative Action Plan ("AAP"), which included a Schedule for Participation of DBE and DBE Disclosure and Participation Certificate. (ECF Nos. 149-14, 149-15.) On both documents, ASI indicated that NWSB's work or service would be "Engineer's Boat, Safety Rigging." (*Id.*) At the time ASI submitted these two documents, however, ASI had not actually negotiated the specifics of its contractual arrangement with NWSB. (ECF No. 146-1 at 62-63.) The Contract, however, was formally awarded to ASI and executed on August 11, 2006. (ECF No. 145-1 at 2.) Subsequently, a subcontract was entered into between ASI and NWSB on October 16, 2006. (*Id.* at 125; ECF No. 146-13.) Gail Svoboda testified that about a month later, ASI began working on the bridge. (ECF No. 146-1 at 125.)

Relator Hedley has testified that in August or September of 2006, after ASI was awarded the Contract, Gail Svoboda told Hedley about the Relators' alleged fraudulent DBE scheme. (Hedley Aff., ECF No. 149-9.) Hedley claims that over a telephone call, he learned that ASI was unable to secure a DBE to satisfy the Contract's 15% DBE participation goal. Instead, ASI reached an agreement with DBE subcontractor NWSB to falsely represent to MSHA that it would, and did, comply with the DBE participation goal. In practice, however, ASI and Brighton would complete all work purportedly subcontracted to NWSB. Specifically, ASI and Brighton rather than NWSB would hire employees from the local union, place them on NWSB's payroll, supervise their work, and front payment for their salaries to make it appear that NWSB had performed the work. With respect to materials and supplies, ASI would negotiate prices, choose quality and quantity of materials, and then when ordering the materials, direct suppliers to invoice NWSB. ASI would then front money

to NWSB to make it appear that NWSB bought the materials and supplies. In return, NWSB was guaranteed an 8% markup on all materials purchased through and payroll processed under NWSB's name.

Although work on the bridge did not begin until the Fall of 2006, ASI's first DBE quarterly report was due on July 15, 2006, (ECF No. 147-9), but it was not submitted on that date. (ECF No. 149-49.) In fact, ASI did not submit DBE quarterly reports for over one year through October of 2007. (*Id.*) On January 14, 2008, after making payments to ASI for almost one and a half years, MSHA sent ASI a letter advising it of its reporting responsibilities. (ECF No. 147-9.) Still, ASI did not submit a DBE quarterly report. (ECF No. 149-49.) Despite not submitting the reports, MSHA continued payments to ASI under the Contract. In fact, MSHA paid ASI more than $9,000,000 of the total $10,381,640 under the Contract between November of 2006 and August of 2008 without receiving any DBE quarterly reports. (ECF No. 144-1 at 12; ECF No. 147-4.) MSHA sent additional letters to ASI on August 7, 2008 and September 17, 2008. (ECF No. 149-49.) The September 17, 2008 letter finally placed ASI in noncompliance and stated that if ASI did not submit the requested information within seven days, the failure to do so could result in further action, up to and including suspension of payment until the requested documents were received. (*Id.*) In response, ASI submitted the quarterly reports. (ECF No. 148-1.) Three months later, on December 5, 2008, ASI applied for final payment under the Contract. (ECF No. 148-5.) On December 14, 2008, MSHA approved ASI's request to sublet "items" to NWSB in the form of "engineers boat" for $41,600.00 and "cleaning & painting bridge" for $1,527,600.00. (ECF No. 147.) Specifically, the approval stated that based on the recommendation of the

"Division Chief, Office of Bridge," the Director, Office of Construction stated that the Contract and award amount were "ok to process; proposed sub[contractor] is MDOT certified MBE; proposed MBE participation goal of 15.12% met w[ith] this request." (*Id.*) On January 13, 2009, the Director, Office of Construction then recommended final payment and acceptance of the construction project. (ECF No. 149-53).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. To make this showing, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In ruling on a motion for summary judgment, a court must consider the facts and all reasonable inferences in the light most favorable to the non-moving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). Further, the court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015)

(explaining that the trial court may not make credibility determinations at the summary judgment stage). However, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations of denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). When ruling on a motion for summary judgment, it is the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Id.* (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## ANALYSIS

### I. The False Claims Act—Counts I and II

The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, in relevant part subjects to civil liability "[a]ny person who knowingly presents or causes to be presented, to . . . the United States Government . . . a false or fraudulent claim for payment or approval," § 3729(a)(1), as well as "[a]ny person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," § 3729(a)(2). The Supreme Court has cautioned that the FCA "was not designed to reach every kind of fraud practiced on the Government." *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950 (1958)); *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451, 456 (4th Cir. 2013). To make a claim under the False Claims Act, a plaintiff must prove "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the

statement or conduct caused the government to pay out money or to forfeit money due." *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) ("*Harrison II*").

The Relators assert that: (A) ASI made a false statement or engaged in fraudulent conduct (i) under the fraudulent inducement theory; (ii) through overt, continued fraudulent statements; and (iii) under the implied certification theory; (B) the fraudulent statements were material; and (C) ASI knowingly made the statements and knew that they were material. Accordingly, the Relators Rauch and Hedley allege that ASI is liable for disgorgement of all payments under the Contract. ASI asserts that it is entitled to summary judgment because there are no genuine issues of material fact that the Relators failed to meet any these requirements. This Court addresses each element in turn.[5]

## A. Alleged False Statement or Fraudulent Course of Conduct

### i. Fraudulent inducement theory

The fraudulent inducement theory extends FCA liability to situations "'when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct.'" *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999) (*Harrison I*)). To ultimately succeed on a fraudulent inducement theory, a plaintiff must show "that (1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the

---

[5] The Relators do not expressly address the fourth prong in their brief, i.e. the statement or conduct caused the government to pay out money or to forfeit money due. As this prong is necessarily intertwined with the materiality requirement, this Court addresses the third and fourth prongs together.

government to pay out money or to forfeit moneys due (i.e., that involved a 'claim').'" *Wilson*, 525 F.3d at 376 (quoting *Harrison I*, 176 F.3d at 788).

Relators contend that ASI obtained the Contract through fraudulent inducement because its bid and Affirmative Action Plan certified that it would comply with the Contract's DBE participation goal when it had no intention of actually permitting NWSB to perform a commercially useful function. Accordingly, the Relators contend that "ASI's initial fraudulent submissions 'and every step thereafter' enabled ASI to press toward its 'ultimate goal—payment of government money to [ASI].'" (ECF No. 149 at 28 (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943)).) ASI argues that the Relators present no evidence that when ASI submitted its bid it did not "intend to achieve" the Contract's DBE goal, and that ASI's certification that it intended to achieve the DBE goal did not require, or include, a commitment that NWSB would perform a commercially useful function under the Contract.

Relators support their theory that ASI never intended to have NWSB perform work under the contract with the self-serving affidavit of the Relator Hedley. (ECF No. 149 at 27.) As described above, Hedley testified that Gail Svoboda told him in August or September of 2006 about ASI's alleged agreement with NWSB to falsely represent to MSHA that it would and did comply with the DBE participation goal. (Hedley Aff., ECF No. 149-9.) From this testimony, the Relators assert that "[t]he only fair interpretation of that evidence is that ASI intended from the very beginning to use NWSB as a pass-through, performing no commercially useful function on the project." (ECF No. 149 at 28.) First, while at the summary judgment stage this Court "must not weigh evidence or make credibility

determinations," *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015),"[a] self-serving affidavit, without more, is not sufficient to defeat summary judgment." *Jeandron v. Board of Regents of University System of Maryland*, No. 12-1724, 510 Fed. App'x. 223, 228 (4th Cir. 2013) (citing *Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000)). This unsubstantiated testimony from one of the Relators in this action is the only evidence the Realtors bring forth for the proposition that at the time ASI bid for and was awarded the Contract, it had no intention for NWSB to perform any work. In fact, the undisputed record before this Court reflects that ASI was awarded the Contract in August of 2006, *before* ASI even entered into a subcontract with NWSB and/or finalized details with NWSB concerning the scope of materials or job specifications.

Second, ASI notes that there is no genuine dispute that ASI did not and was not required to certify that NWSB would perform a "commercially useful function" under the Contract. The phrase "commercially useful function" is found once in the Contract, stating that a "bidder may count sixty (60) percent of its expenditures to a DBE regular dealer, . . . provided that the DBE supplier performs a commercially useful function in the process." (ECF No. 145-1 at 54.) The Contract does not define commercially useful function or reference it in any other provision. Relators, however, now define the phrase by relying on federal regulations, and argue that NWSB did not perform a commercially useful function under the Contract.

The Contract states: "the disadvantaged business enterprise requirements of 49 C.F.R. 26 . . . apply to this agreement." (ECF No. 145-1 at 52.) The federal regulations found in 49 C.F.R. § 26, "Participation by Disadvantaged Business Enterprises in

Department of Transportation Financial Assistance Programs," seek to achieve several objectives, including creating a level playing field on which DBEs can fairly compete for DOT-assisted contracts, promoting the use of DBEs in federally-assisted contracts and procurement activities conducted by recipients, and providing appropriate flexibility to recipients of federal financial assistance in establishing and providing DBEs opportunities. 49 C.F.R. § 26.1. Section 26.41 explains that the Government's statutory 10 percent goal under the Programs is "aspirational" and "does not authorize or *require* recipients to set overall or contract goals at the 10 percent level . . . or to take any special administrative steps if their goals are above or below 10 percent." 49 C.F.R. § 26.41 (emphasis added). Further, recipients "are not required to set a contract goal on every DOT-assisted contract." 49 C.F.R. § 26.51. *If* a recipient, such as MSHA, sets a DBE goal, then the *recipient* is responsible for counting expenditures to DBE contractors only if the DBE is performing a commercially useful function, and defines commercially useful function. Accordingly, the regulations define what MSHA, as the recipient, was required to assess when determining the Contract's contribution to its own DBE goals; it does not define what ASI certified it intended to do when it submitted its bid.[6]

As to NWSB's work under the Contract, the work on the bridge was primarily sourced locally through a union. Because NWSB did not have a relationship with a local union, the Brighton Painting Company, owned by the Relators Rauch and Hedley, and Paul Marley, the General Superintendent working on the bridge, helped find union workers for

---

[6] This is consistent with the Relators relying on the affidavit of a DOT employee, rather than a MSHA employee, to describe a test for whether a DBE is performing a commercially useful function. (Ashby Dep., ECF No. 149-3 at 76.)

the job. Mr. Jack Casey, an NWSB employee, then hired the local workers. (Casey Dep., ECF No. 146-9 at 236-37 (explaining that the general contractor had a connection with the union prior to him hiring the union workers). These employees were placed on NWSB's payroll and NWSB was responsible for their benefits and workers compensation. Mr. Casey ordered and acquired the scaffolding, rigging and containment equipment that the employees needed. (*Id.* at 55-56.) Marley testified that NWSB was in charge of various tasks including working with the barges, scaffolding, and containment tarps. (Marley Dep., ECF No. 146-5.) Relators place heavy emphasis on the fact that ASI advanced funds to NWSB, however, as Robert Ashby, former Deputy Assistant General Counsel for Regulation and Enforcement at U.S. DOT testified, there is not a regulation that says "advancing funds is prohibited."[7] (Ashby Dep., ECF No. 150-3 at 75, 78.) Accordingly, even if NWSB was required to perform a commercially useful function, evaluating the "amount of work subcontracted, industry practices," and other relevant factors, 49 C.F.R. § 26.55(c), NWSB performed a commercially useful function.

Further, as discussed in more detail below, the Relators have not met the materiality requirement under the fraudulent inducement theory. Specific to this theory, "[b]ecause fraudulent inducement claims are concerned with whether 'the contract or extension of government benefit was obtained *originally* through false statements or fraudulent conduct,'

---

[7] Throughout Relators argument that NWSB did not perform a commercially useful function under the Contract, they assert that NWSB *could not* have performed on the Contract because NWSB was not a certified DBE in the areas of safety rigging, containment and related services. To the extent MDOT's approval of NWSB as a DBE in "water transportation services," including among other things inspection access equipment and work platforms, does not cover safety rigging, containment, and related services, this argument cuts both ways. On the one hand, ASI may have known from this description that NWSB was not certified to perform the work it was indicating NWSB would perform on the Contract. On the other hand, MSHA approved NWSB's work under the Contract knowing what work NWSB was certified to perform.

*Harrison I*, 176 F.3d at 787 (emphasis added), the [original false statement's] materiality depends on whether it could have influenced the government's decision to award" ASI the Contract. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008). Relators argue that MSHA would not have awarded ASI the Contract, and subsequently would not have submitted claims to the Department of Transportation for payment, had it known ASI did not intend to have NWSB meet the DBE requirement. To support both of these assertions, Relators rely on the general affidavits of MSHA's Director of the Office of Equal Opportunity (Dade Aff., ECF No. 149-16) and the former Deputy Assistant General Counsel for Regulation and Enforcement at U.S. DOT (Ashby Aff., ECF No. 149-17). Six years after filing suit against ASI, the FCA materiality requirement demands more than boilerplate statements that had MSHA or DOT known that "a bidder" did not intend to meet DBE requirements, a contract would not have been awarded or approved. Indeed, it is undisputed that MSHA continued to make payments on the Contract despite repeated failure by ASI to provide DBE quarterly reports. For all of the above reasons, Relators' fraudulent inducement theory fails.

### ii.    Alleged continued false representations

Relators also assert that ASI continually made false representations during the execution of the Contract. To satisfy the first element of an FCA claim, the statement or conduct must be objectively false. *Wilson*, 525 F.3d at 376 (citing *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)). Neither "[a]llegations of poor and inefficient management of contractual duties" nor "imprecise statements or differences in interpretation growing out of a disputed legal question" are actionable under the FCA. *Id.*

(internal citations omitted). Relators contend that ASI continued to make false statements when it submitted weekly payroll records, DBE quarterly reports, progress estimates, and the final Request for Approval of Subcontractor and final Certification. (ECF No. 149 at 22-23.) ASI argues that (1) these documents did not contain "overtly false" representations; and (2) the documents did not reach, and therefore could not have had an effect on, the Government's payment under the Contract.

Beginning with the payroll records and progress reports, neither of these groups of documents made representations about progress towards the DBE goal or NWSB's work under the Contract. The payroll records listed the names of individuals being paid by NWSB under the Contract and the amounts they were paid. (ECF No. 144-1 at 21.) The progress reports certified that ASI was making payments to labor and material men and subcontractors. (ECF No. 147-5.) Further, each progress report was signed and approved by a State Highway Administration project engineer. (*Id.*)

As to the DBE quarterly reports, they listed the name of the DBE/MBE, specifically NWSB, items of work and services performed, and the DBE/MBE percentage of completion. (ECF No. 148-1.) As explained above, NWSB was not required to be performing a "commercially useful function." If that was a requirement, however, the quarterly reports documented the work which NWSB was performing but did not identify specific tasks or require ASI to certify that the NWSB was performing a commercially useful function. Relators also assert that ASI's Request for Approval of Subcontractor and final Certification to MSHA contained false representations for similar reasons as the quarterly reports. Again, all that the Request for Approval required ASI to certify was that NWSB was

the DBE working under the Contract, and that it had met the DBE goal. (ECF No. 149-52.) On the final Certification, ASI stated that it had made all required payments to its subcontractors. (ECF No. 149-53.) Like the quarterly reports, they did not require ASI to specify how NWSB performed a commercially useful function.[8] Therefore, Relators have not shown that ASI made false and fraudulent claims throughout the course of the Contract.

In addition to these documents not containing false statements, these documents were not passed from MSHA to the Government. Rather, to obtain funds from the Federal Highway Administration ("FHA"), an operating administration of the Department of Transportation, MSHA submitted a "flat file" for each of its federally-funded projects. (Hall Decl., ECF No. 144-2.) While this file contained information about costs incurred on MSHA's projects, it notably did not contain information about the DBE goals for particular projects or whether those goals were being met. (ECF No. 144-1 at 22; ECF No. 144-5.)

### iii. Implied certification theory

In *Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989, 2001, 195 L.Ed.2d 348 (2016), the Supreme Court stated that the implied certification theory can be a basis for liability under the FCA if (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose non-compliance with material statutory, regulatory, or contractual requirements makes those misleading half-truths." To support their arguments, the Relators rely heavily on the Fourth Circuit opinion in *United States v. Triple Canopy, Inc.*, 857 F.3d 174

---

[8] Further, as described below, the quarterly reports were the *only* documents that ASI was required to submit on a regular basis that referred to the DBE percentage goal. Yet, it is undisputed that MSHA paid ASI over $ 9,000,000 under the Contract without receiving a single report.

(4th Cir. 2017) ("*Triple Canopy II*").[9] In *Triple Canopy II*, the Government awarded Triple Canopy a contract to provide security services, a requirement of which was that Triple Canopy needed to "ensure that all employees have . . . qualified on a U.S. Army qualification course." *Id.* at 175. Triple Canopy, however, brought in guards who were unable to meet this requirement. *Id.* Despite not meeting the requirement, Triple Canopy falsified scorecards throughout the year and submitted invoices on a monthly basis. *Id.* When the United States filed an FCA claim, Triple Canopy argued that the invoices did not contain falsities on their face because they did not require Triple Canopy to certify that its guard services complied with the contract's responsibilities. The Fourth Circuit disagreed, explaining "although Triple Canopy knew its 'guards' had failed to meet a responsibility in the contract, it nonetheless requested payment each month from the Government for those 'guards.'" *Id.* at 178. Accordingly, the court reasoned that "anyone reviewing Triple Canopy's invoices "'would probably—but wrongly—conclude that [Triple Canopy] had complied with *core* [contract] requirements.'" *Id.* (quoting *Universal Health Services, Inc. v. United States ex rel. Escobar*, __U.S.__, 136 S.Ct. 1989 (2016)) (emphasis added). Relators argue that like in *Triple Canopy*, "although ASI knew it was not complying with its responsibilities under the Contract with regard to NWSB, it nonetheless continually requested payment from the Government." (ECF No. 149 at 32.)

First, as described above, NWSB was only required to perform work under the Contract. It was not required to perform a "commercially useful function." NWSB did perform work under the Contract by hiring local union workers and performing the barge,

<hr />

[9] As described in more detail below, the opinion in *Triple Canopy II* followed the Supreme Court vacating and remanding the prior opinion in *Triple Canopy I* for further consideration.

tarp, and scaffolding work tasks. Second, as described in more detail below with regard to materiality, meeting the DBE goal was not a "core contract requirement." *Triple Canopy II*, 857 F.3d at 178. Accordingly, there is no genuine dispute that the Relators have failed to show that ASI made false statements or engaged in a fraudulent course of conduct under the FCA. For this reason alone, summary judgment is warranted. However, this Court will discuss the additional elements of an FCA claim which have not been met and compel Summary Judgment in favor of the Defendant ASI.

### B. Materiality

The FCA defines material as "having a natural tendency to influence, or to be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). The Fourth Circuit has reiterated that the FCA requires "'strict enforcement of the Act's materiality and scienter requirements.'" *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 176 (4th Cir. 2017) ("*Triple Canopy II*") (quoting *United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 632-33 (4th Cir. 2015)). Both parties rely on *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016) and the subsequent Fourth Circuit decision in *Triple Canopy II*. In *Universal Health*, the Supreme Court explained that:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* at 2003.

On the other hand, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement *must be material to the Government's payment decision* in

order to be actionable under the False Claims Act." *Id.* at 2002 (emphasis added). Subsequent to the *Universal Health* decision, the Fourth Circuit was tasked in *Triple Canopy II* with deciding whether the Supreme Court opinion altered its prior finding in *Triple Canopy I* that the plaintiff met the FCA's materiality requirement. As described above, the falsity in *Triple Canopy* involved the defendant falsely representing that all of its employees were qualified pursuant to a U.S. Army qualification course. In *Triple Canopy I*, the court explained that the Government sufficiently pled materiality when:

> Common sense strongly suggests that the Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term, shoot straight. . . . Triple Canopy agreed to provide a service that met certain objective requirements, failed to provide that service, and continued to bill the Government with the knowledge that it was not providing the contract's requirements.

775 F.3d at 637-38. Extending the Supreme Court's hypothetical in *Universal Health* that the Government does not need to specify in an order for guns that it is material that the guns be able to shoot, "[g]uns that do not shoot are as material to the Government's decision to pay as guards that cannot shoot straight." *Triple Canopy II*, 857 F.3d at 179.

Relators argue that the false statements regarding NWSB's work under the Contract were material because MSHA would not have awarded the Contract to ASI had it known that ASI did not have the "ability or intent" to meet the Contracts' DBE goal. Further, they argue that had MSHA discovered the fraudulent statements, MSHA would not have submitted claims to the Department of Transportation ("DOT") and in turn DOT would not have released funds to MSHA. To support both of these assertions, Relators rely on the affidavits of Wanda Dade and Robert Ashby. Wanda Dade is MSHA's Director of the

Office of Equal Opportunity. (Dade Aff., ECF No. 149-16.) In her affidavit, she states that "[i]f MSHA discovers during the bidding process for a DOT-funded contract that a bid includes false representations and certifications regarding the bidder's ability or intent to satisfy the contract's DBE participation goal . . . MSHA will not award the contract to that bidder." (*Id.* at ¶ 4.) Similarly, the affidavit of Ashby, former Deputy Assistant General Counsel for Regulation and Enforcement at U.S. DOT, states that if the Federal Highway Administration ("FHA"), an operating administration of DOT, had learned during the performance of a DOT contract that a contractor had falsely certified compliance with the contract's DBE participation goal, FHA would deny claims for payment received from the state administering the contract. (Ashby Aff., ECF No. 149-17.) ASI argues that the above affidavits are insufficient evidence to prove that the "false" statements were material.

Over six years after the Relators initially filed suit against ASI, their materiality argument hinges on the general, five paragraph affidavits described above from the MSHA and DOT employees. These affidavits, however, are insufficient to meet the high standard both the Supreme Court and the Fourth Circuit have set to ensure that the FCA is not enforced by the judiciary as "an all-purpose antifraud statute." *Universal Health*, 136 S.Ct. at 2003. The affidavits neither reference the Contract at issue nor discuss any type of specific DBE contract. In contrast, the Contract at issue clearly states that a bidder may not meet the DBE requirements so long as it made a good faith effort to meet the Contract goals. (ECF No. 145-1 at 55.) Further, if a party was placed in noncompliance, which ASI eventually was, MSHA *could* choose from various sanctions including suspension of work, withholding payment or *any other sanction* as appropriate. (*Id.* at 58.) *See United States v. Sanford-Brown, Ltd.,*

840 F.3d 445, 447–48 (7th Cir. 2016) ("At bottom, even assuming [the plaintiff's] allegations are true, the most he has shown is that [the defendant's] supposed noncompliance and misrepresentations would have entitled the government to decline payment. Under *Universal Health*, that is not enough.").

Further, the record shows that ASI continued to be paid even though ASI did *not* submit the only documents that were directly relevant to DBE participation. ASI's first DBE quarterly report was due in July of 2006. ASI did not submit a report in July of 2006, nor did it submit the reports for the next two years. In fact, it was not until January of 2008 that MSHA even contacted ASI to say that MSHA had not received a single DBE quarterly report. Even then, it would not be until nine months later in September of 2008 that MSHA placed ASI in noncompliance and stated that if ASI did not submit the requested information within seven days, the failure to do so *could* result in further action, up to and including suspension of payment until the requested documents were received. (ECF No. 149-49.) Accordingly, MSHA paid ASI more than $9,000,000 under the Contract between November of 2006 and August of 2008 without receiving DBE quarterly reports. (ECF No. 144-1 at 12; ECF No. 147-4.) The undisputed record therefore clearly demonstrates that compliance with the DBE requirement was not a condition of payment. At most, MSHA had the option to decline payment, which it did not invoke until after it had paid about 90% of the Contract amount. This is in contrast to the situation in *Triple Canopy* where meeting the DBE requirement was essential to fulfilling the ultimate objective of the Contract. *See Triple Canopy I*, 775 F.3d (explaining that "Triple Canopy, a security contractor with primary responsibility for ensuring the safety of servicemen and women stationed at an airbase in a

combat zone, knowingly employed guards who were unable to use their weapons properly and presented claims to the Government for payment for those unqualified guards"). Under any analysis, there is simply no genuine issue of material fact as to the materiality of any alleged misrepresentations by ASI.

### C. Requisite scienter

Further, Defendant ASI notes that even if it submitted false claims, the Relators have not presented any evidence that ASI "knowingly" submitted the false claims. The FCA defines the scienter requirement of "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A); *Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989, 2001, 195 L.Ed.2d 348 (2016). The Relators must show that ASI (1) knowingly violated a requirement that (2) it knew was material to the Government's payment under the Contract. *United States ex rel. Garzione v. PAE Gov't Servs., Inc.,* No. 16-1349, 670 Fed. App'x 126 (4th Cir. Nov. 3, 2016). As to the latter requirement, the Supreme Court has stated that "[a] defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment." *Health Services*, 136 S.Ct. at 2001.

First, Relators have not shown that ASI knowingly violated a requirement under the Contract. For all of the reasons explained above, ASI's requirement under the Contract was to use its DBE subcontractor NWSB to complete at least 15% of the Contract. Further, the Contract stated and Gail Svoboda understood that under the Contract, ASI could not meet this requirement provided that it made a good faith effort. Second, for the reasons explained

above the DBE requirement was not material to the Contract, and accordingly ASI did not know that is was material to the Government's payment under the Contract. Rather, ASI received over $9,000,000 under the Contract without ever submitting a quarterly DBE participation report. Further, the progress estimates were signed and approved by a State Highway Administration project engineer. (*Id.*) Accordingly, Judgment is ENTERED in favor of ASI on Counts I and II.

## II.     The False Claims Act—Count III

The False Claims Act also imposes civil liability on those individuals who "conspire[] to defraud the government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). While the Act does not define conspiracy, courts have concluded that general civil conspiracy principles apply. *See, e.g.*, *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999); *United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 50 (D.D.C. 2011). To state a conspiracy claim under § 3729(a)(3), a plaintiff must allege that the defendant "conspired with one or more persons to have a fraudulent claim paid by the United States, . . . that one or more of the conspirators performed any act to have such a claim paid by the United States, and . . . that the United States suffered damages as a result of the claim." *Id.* (quoting *United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994) (internal citations omitted)). Further, the plaintiff must plead that the alleged conspirators "had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008).

As this Court explained in its previous Memorandum Opinion, a conspiracy claim is

premised on the underlying False Claims Act claims and "rises and falls with the individual claims." *United States ex rel. Hedley v. Abbe & Svoboda, Inc.*, 199 F.Supp.3d 945, 956 (D. Md. 2016) (quoting *United States ex rel. Godfrey v. KBR, Inc.*, No. 08-1423, 360 Fed. App'x 407, 413 (4th Cir. 2010)). Because there is no genuine dispute of material fact with respect to the claims set forth in Counts I and II under the False Claims Act, there is no genuine dispute of material fact with respect to the conspiracy claim. Accordingly, Judgment is ENTERED in favor of ASI on Count III.

## III. Damages

Finally, ASI argues alternatively that, in any event, it would be entitled to summary judgment on Relators' claim for actual damages. Under the FCA, it is the *qui tam* Relators' burden to prove damages, as they stand in the place of the Government. 31 U.S.C. § 3731(c). The Fourth Circuit and other courts acknowledge two standard measurements of damages in FCA cases.[10] In a case where the Government receives a tangible benefit in the form of goods or services, the measure is "the amount of money the government paid by reason of the false statement above what it would have paid absent the false statement" (the "benefit of the bargain" method). *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922 (4th Cir. 2003) ("*Harrison II*") (citing *United States v. Ekelman & Assocs.*, 532 F.2d 545, 550 (6th Cir. 1976)). In a case where the Government receives an intangible benefit incapable of being measured, damages equal the total amount the Government paid (the "disgorgement" method). *Id.* at 923, n. 17 (citing *United States v. TDV Mgmt. Corp.*, 288

---

[10] In *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922 (4th Cir. 2003) ("*Harrison II*"), the Fourth Circuit acknowledged that it has "not adopted one particular standard by which damages should be measured under the FCA."

F.3d 421, 428 (D.C. Cir. 2002)). In *Harrison II*, the Fourth Circuit applied the benefit of the bargain measure after finding that despite making false representations that the defendant did not have any "organizational conflicts of interest" with a subcontractor working on a government subcontract, "there was no evidence adduced at trial suggesting that [the subcontractor] failed to perform the work that it was required to perform under the subcontract or that the government did not receive the benefit of the work performed." *Id.* at 923.

The Realtors assert that "[b]ecause ASI's fraud deprived the Government of the basic objective of th[e] DOT-funded Contract—assisting small and minority businesses—the Government did not get the intangible benefit that it paid for" and accordingly disgorgement of all payments is required. (ECF No. 149 at 25-26.) Further, they assert that ASI's reliance on *Harrison II* is misplaced because "this case involves a grant to a recipient with no direct tangible benefit." (*Id.* at 37.) The Relators rely on two related Western District of Pennsylvania cases for the proposition that disgorgement is appropriate in fraudulent DBE cases: *United States ex rel. Layman v. Bombardier Transp. (Holdings) USA*, 2009 WL 793627 (W.D. Pa. Mar. 23, 2009) and *United States ex rel. Layman v. Bombardier Transp. (Holdings) USA*, 656 F.Supp.2d 540 (W.D. Pa. 2009). In *Layman*, a contractor was accused of fraudulently submitting DBE reports under a contract with the San Francisco Bay-area ("BART"). Unlike this case, however, at the summary judgment stage the plaintiff brought forth evidence that "[u]pon receipt of the reports, BART would forward them to DOT to allow DOT to evaluate DBE participation and compliance with federally funded contracts." *Layman*, 2009 WL 793627, at *3. Further, BART and DOT used the reports "to evaluate the success of the

DBE program on a contract-by contract basis and on a district and nationwide level." *Id.* Accordingly on the issue of damages the court held that "*if* [the defendant's figures] were incorporated into DOT's and BART's cumulative DBE program totals, then the government was harmed in that it reimbursed BART for payments to Bombardier even though its DBE program was being undermined by false certification of compliance with DBE regulations." *Id.* at *14 (emphasis added).

Unlike in *Layman*, the Relators have brought forth no such evidence that the Government would have been harmed if ASI's statements regarding DBE compliance were false. Without any specific contractual obligations as shown in *Layman*, this Court relies on the implementing federal regulations referenced in the Contract. Those regulations explain that the Government's statutory ten percent goal under the Participation by DBEs in Department of Transportation Financial Assistance Programs is "aspirational" and "does not authorize or *require* recipients to set overall or contract goals at the 10 percent level . . . or to take any special administrative steps if their goals are above or below 10 percent." 49 C.F.R. § 26.41 (emphasis added). Further, recipients "are not required to set a contract goal on every DOT-assisted contract." 49 C.F.R. § 26.51. While the *Harrison II* court noted that it applied the benefit of the bargain standard given "the particular facts of th[at] case," the facts of this case require this Court to conclude that it is appropriate here as well. Like in *Harrison II*, the Relators have not presented any evidence that the value of the work performed under the Contract depended on whether ASI truthfully certified to MSHA that it was meeting the DBE participation goal. ASI was the lowest bidder on the Contract,

completed the Severn River Bridge, and received all payments under the Contract.[11]

Accordingly, summary judgment is granted as to the Relators' claim for actual damages.

## CONCLUSION

For the reasons stated above, Defendant ASI's Motion for Summary Judgment (ECF No. 144) is GRANTED and Judgment is ENTERED in favor of ASI on all remaining counts.

A separate order follows.


Dated: March 19, 2018

_/s/_____

Richard D. Bennett
United States District Judge

---

[11] The Relators rely on two additional cases that, unlike here, involved the Government awarding research grants under the Small Business Innovation Research and/or Small Business Technology Transfer Programs. Finding that the Government did not obtain a tangible benefit, the courts applied the disgorgement method. *See United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009) ("The contracts entered into between the government and the Defendants did not produce a tangible benefit to the BMDO or the Air Force. *These were not, for example, standard procurement contracts where the government ordered a specific product or good.* The end product did not belong to the BMDO or the Air Force. Instead, the purpose of the SBIR grant program was to enable small businesses to reach Phase III where they could commercially market their products.") (emphasis added); *see also United States v. Anghaie*, No. 15-10454, 633 Fed. App'x. 514 (11th Cir. Nov. 30, 2015) ("The government does not own the research it subsidizes through these programs or share in the profits from commercial applications.").